## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **ELLA SUN MARTIN** | : | Case No.: 1:14-cv-00298-RLY-DKL |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **STOOPS BUICK, INC.,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **DEBRA TRAUNER,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

---

### PLAINTIFF'S AMENDED BRIEF IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. 42]

---

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and S.D. Ind. L.R. 56-1(b), Ella Sun Martin ("Plaintiff"), by counsel, respectfully submits her Brief in Response to Defendant Stoops Buick, Inc. ("Stoops") and Defendant Debra Trauner's ("Trauner") (Stoops and Trauner are sometimes collectively referred to herein as the "Defendants") Motion for Summary Judgment [Dkt. 42; *See* Dkt. 43], and requests that this Court enter an order denying the Defendants' Motion for Summary Judgment for the facts and reasons set forth below.

Gabriel J. Quearry (#30412-32)
QUEARRY LAW, LLC
386 Meridian Parke Lane, Suite A
Greenwood, Indiana 46142
(317) 285-9896 (telephone)
(317) 882-5602 (facsimile)
gq@quearrylaw.com
*Attorney for Plaintiff,*
*Ella Sun Martin*

**TABLE OF CONTENTS**

**Sections**                                                                                          **Page**

Table of Contents……………………………………………………………….. 2

Table of Authorities………………………………………………………….... 4

Statement of Issues……………………………………………………….....7

I.        Introduction……………………………………………………8

II.       Legal Standards……………………………………………… 8

          A.       Summary Judgment Standard……………………………….... 8

          B.       Exhaustion of Administrative Remedies………………………… 9

          C.       Discrimination Based on Race, Religion, and National Origin……………12

                   1.       The Direct Method………………………………………....12

                   2.       The Indirect Method………………………………………...13

                            a.       The "Prima Facie Threshold"………………………………14

                            b.       Satisfaction of the Employer's Legitimate Expectations…...14

                            c.       Similarly Situated Co-Workers……………………………15

                            d.       Demonstrating Pretext…………………………………...17

          D.       Intentional Infliction of Emotional Distress…………………………18

III.      Statement of Material Facts in Dispute……………………………………19

IV.       Application………………………………………………………44

          A.       Plaintiff Can Bring Her Claim For Racial Discrimination…………………45

          B.       Plaintiff Presents Direct Evidence That Stoops Harassed, Retaliated
                   Against, And Discharged Her On The Basis Of Her Race, Religion,
                   And National Origin……………………………………………...46

                   1.       Trauner's Discriminatory Election …………………………47

2.  Trauner's Ambiguous Statements About Her Reasons For Firing Plaintiff Directly Point To The Discriminatory Intent Of Stoops' Decision To Fire Plaintiff ……………………… 48

3.  Evidence of Suspicious Timing Points Directly To Trauner's Discriminatory Animus……………………….……… 49

4.  Evidence That Office Employees Outside of Plaintiff's Protected Classes Systematically Received Better Treatment Than Plaintiff Points Directly to Trauner's Discriminatory Intent……………….…………………………………… 50

C.  Plaintiff Presents Evidence Establishing Employment Discrimination Through The Indirect Method…………………………………………….... 51

1.  Stoops Failed To Articulate A Nondiscriminatory Reason For Trauner's Religious Harassment Of Plaintiff ……………………… 52

2.  Goodin's Experience In The Car Dealership Industry Is Irrelevant …………………………………………….……………53

3.  "There Was Not A Time That Plaintiff's Accounting Degree Wasn't Beneficial"…………………………………………… 54

4.  Stoops' Claim That Goodin Was Immediately "Work-Ready" Is Contradicted by the Evidence ……………………………..…… 55

5.  Stoops' Reason That It Terminated Plaintiff Because She Required Weekly Training Sessions Is Factually Baseless ………. 56

6.  Plaintiff Made At Most Two Payroll Errors During Her Eleven Months Of Employment……………………………..… 56

7.  Stoops Has Failed To Give An Honest Explanation For Its Behavior …………………………………………….……… 57

D.  Plaintiff Survives Summary Judgment On Her Claim For Intentional Emotional Distress Against Trauner Under Indiana State Law……………....58

IV.  Conclusion………………………………………………………....59

Certificate of Service……………………………………………...59

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page Numbers**

*Adams v. Walmart Stores, Inc.,* 324 F.3d 935 (7th Cir. 2003)……………...13, 47

*Alexander v. Gardner-Denver Co.,* 415 U.S. 36 (1974)…………………….9

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)……………………..8

*Babrocky v. Jewel Food Co.,* 773 F.2d 857 (7th Cir. 1985)………………...10

*B.K.B. v. Maui Police Dep't,* 276 F.3d 1091 (9th Cir. 2002)………………10

*Brindley v. Target Corporation,* 761 F.Supp.2d 801 (N.D. Ill. 2011)……...11

*Burks v. Wisconsin Dep't of Transp.,* 464 F.3d 744 (7th Cir. 2006)………. 13-14

*Burnell v. Gates Rubber Co.,* 647 F.3d 704 (7th Cir. 2011)……………….12, 13, 44, 45, 46

*Cain v. City of Muncie,* No. 1:13-cv-01127-SEB-MJD, ECF No. 76
(S.D. Ind. May 4, 2015), *appeal docketed*, No. 15-2225
(7th Cir. June 4, 2015)……………………………………………………11, 43

*Carroll v. Yellow Freight Systems, Inc.,* 01 C 6755
(N.D. Ill. Sep. 23, 2003)……………………………………………………11

*Chaney v. Plainfield Healthcare Center,* 612 F.3d 908 (7th Cir. 2010)……16

*Cheek v. Western & S. Life Ins. Co.,* 31 F.3d 497 (7th Cir. 1994)………….9, 10, 44

*Coleman v. Donahoe,* 667 F.3d 835 (7th Cir. 2012)……………………….8, 14-16, 49, 52

*Curry v. Menard, Inc.,* 270 F.3d 473 (7th Cir. 2001)……………………… 13, 15

*Curry v. Whitaker,* 943 N.E.2d 354 (Ind. Ct. App. 2011)…………………..18

*Dale v. Chicago Tribune Co.,* 797 F.2d 458 (7th Cir. 1986)………………14, 17, 18

*Darchak v. City of Chicago Bd. of Educ.,* 580 F.3d 622 (7th Cir. 2009)…...13, 45, 46

*Debs v. Northeastern Ill. Univ.,* 153 F.3d 390 (7th Cir. 1998)…………….8, 14, 17, 18

*Elkhatib v. Dunkin Donuts, Inc.,* 493 F.3d 827 (7th Cir. 2007)…………… 14

*Finley v. Ill. Dep't of Public Aid,* 1998 WL 26156

(N.D. Ill. Jan. 12, 1998)……………………………………………………… 11

*Flores v. Preferred Technical Group,* 182 F.2d 512 (7th Cir. 1999)……… 12, 13, 14

*Gates v. Caterpillar, Inc.,* 513 F.3d 680 (7th Cir. 2008)…………………... 16, 49

*Harper v. Godfrey Company,* 45 F.3d 143 (7th Cir. 1995)…………………9

*Hong v. Children's Mem'l Hosp.,* 993 F.2d 1257 (7th Cir. 1993)………….13, 15

*Humphries v. CBOCS West, Inc.,* 474 F.3d 387 (7th Cir. 2007)…………... 16, 17

*Jackson v. E.J. Brach Corp.,* 176 F.3d 971 (7th Cir. 1999)……………...17

*Jackson v. Local 707, Int'l Bd. of Teamsters,* 2002 WL 460841
(N.D. Ill. Mar. 26, 2002)……………………………………………………11, 12, 43

*Jayasinghe v. Bethlehem Steel Corp.,* 760 F.2d 132 (7th Cir. 1985)……… 14, 50

*Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.2d 164 (7th Cir. 1976)
(en banc)……………………………………………………………………9, 44

*Jordan v. Whelan Security of Ill., Inc.,* 30 F.Supp.3d 746 (N.D. Ill. 2014)...11, 43

*Jones v. Res-Care, Inc.,* 613 F.3d 665 (7th Cir. 2010)…………………….. 10

*Lloyd v. Swifty Transp., Inc.,* 552 F.3d 594 (7th Cir. 2009)……………….. 10

*McDonnell-Douglas v. Green,* 411 U.S. 792 (1973)………………………. 12, 15

*Murray v. Golden Rule Ins. Co.,* 23 F.Supp.3d 938 (S.D. Ind. 2014)………9, 44

*Novitsky v. Amer. Consulting Engineers, L.L.C.,* 196 F.3d 699
(7th Cir. 1999)……………………………………………………………10, 11, 43

*Oest v. Illinois Dep't of Corr.,* 240 F.3d 605 (7th Cir. 2011)……………… 12, 13, 44, 47

*Peals v. Eli Lilly,* 5 F.Supp.3d 996 (S.D. Ind. 2014)……………………… 13, 14, 15, 50

*Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557 (7th Cir. 1987)………….. 18

*Robin v. Espo Eng'g Corp.,* 200 F.3d 1081 (7th Cir. 2000)……………….13

*Rush v. McDonald's Corp.,* 966 F.2d 1104 (7th Cir. 1992)………………...9, 10

*Shifrin v. Liberty Mutual Ins.,* 991 F.Supp.2d 1022 (S.D. Ind. 2014)……... 18, 57

*Sickinger v. Mega Systems, Inc.,* 951 F.Supp. 153 (N.D. Ind. 1996)..........10, 11

*Smith v. Flax,* 618 F.2d 1062 (4th Cir. 1980)....................................... 18

*Snipes v. Illinois Dep't of Corr.,* 291 F.3d 460 (7th Cir. 2002)................16, 17

*Srail v. Village of Lisle,* 588 F.3d 940 (7th Cir. 2009)........................... 16

*Stockwell v. City of Harvey,* 597 F.3d 895 (7th Cir. 2010).....................12

*Swearnigen-El v. Cook Cnty. Sheriff's Dep't,* 602 F.3d 852
(7th Cir. 2010)...............................................................................11

*Testerman v. EDS Technical Prods. Corp.,* 98 F.3d 297 (7th Cir. 1996).....9

*United States Postal Serv. Bd. of Governors v. Aikens,*
460 U.S. 711 (1983)...................................................................... 14

*Vakharia v. Swedish Covenant Hosp.,* 190 F.3d 799 (7th Cir. 1999)......... 15, 17, 18

*Vela v. Village of Sauk Village,* 218 F.3d 661 (7th Cir. 2000)............... 10, 11, 12, 43

*Villa v. City of Chicago,* 924 F.2d 629 (7th Cir. 1991)........................ 13

*Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394 (7th Cir. 1997)............12, 45

*Wojtanek v. Pactiv LLC,* 492 F.App'x 650 (7th Cir. 2012)....................11

*Wohl v. Spectrum Mfg., Inc.,* 94 F.3d 353 (7th Cir. 1996).....................9

*Wolf v. Buss America, Inc.,* 77 F.3d 914 (7th Cir. 1996).......................9, 18

## **Statutes**

42 U.S.C. § 2000e-2(a)(1)................................................................ 12

Fed. R. Civ. P. 56(a)........................................................................8

Fed. R. Civ. P. 56(c)(1)(A)............................................................... 8

## <u>STATEMENT OF ISSUES</u>

A.      Can Plaintiff bring her racial discrimination claim?

B.      Did Trauner's nine-months of weekly asking Plaintiff to read the Bible with her, telling
Plaintiff about her Christian beliefs, and bring Plaintiff religious items and materials
amount to discriminatory harassment or hostile work environment?

C.      Did Stoops discriminate against Plaintiff on the basis of her race, religion, or national
origin by terminating her employment on February 25, 2013?

D.      Could reasonable jurors find that Trauner's conduct satisfied the legal standard for
intentional infliction of emotional distress under Indiana state law?

## I.      INTRODUCTION

"Jacob have I loved, but Esau I have hated." Malachi 1:2-3. "Who would not be able to see here that it is election alone that discriminates among them?" John Calvin, *Commentary on Romans*, 11:7, Parker, Thomas Henry Lewis, ed. *Iohannis Calvini Commentarius in Epistolam Pauli ad Romanos*, 244-45, Leiden, 1981.

"And the LORD hardened Pharaoh's heart, and he did not let the sons of Israel go out of his land." Exodus 11:10. "Did [God] harden [Pharaoh's heart] by not softening it? This is indeed true, but he did something more. He turned Pharaoh over to Satan to be confirmed in the obstinacy of his breast." Calvin, John. *Institutes of the Christian Religion*. (1539). *Corpus Reformatorum*, 29:354, Berlin and Leipzig, 1834–.

## II.     LEGAL STANDARDS

### A.      Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is only proper where the movant cites to pleadings, depositions, interrogatory answers, admissions, affidavits or declarations, and other materials to "show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A). *See Debs v. Northeastern Ill. Univ.,* 153 F.3d 390, 394 (7th Cir. 1998).  In assessing whether the Defendants are entitled to summary judgment, this Court must examine the record in the light most favorable to Plaintiff as the non-moving party, "resolving all evidentiary conflicts in her favor and according her the benefit of all reasonable inferences that may be drawn from the record." *Coleman v. Donahoe,* 667 F.3d 835, 842 (7th Cir. 2012); *see Debs,* 153 F.3d at 394 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)). The Court must "apply this standard bearing in mind that questions of intent and credibility often are determinative in

employment discrimination cases." *Testerman v. EDS Technical Prods. Corp.,* 98 F.3d 297, 301

(7th Cir. 1996) (citing *Wohl v. Spectrum Mfg., Inc.,* 94 F.3d 353, 355 n. 1 (7th Cir. 1996)); *see*

*Wolf v. Buss America, Inc.,* 77 F.3d 914, 918-919 (7th Cir. 1996);

### B.     Exhaustion of Administrative Remedies

The general rule in employment discrimination cases is that "a plaintiff may not bring

claims under Title VII that were not originally brought among the charges made to the EEOC."

*Harper v. Godfrey Company,* 45 F.3d 143, 147-148 (7th Cir. 1995), *citing Alexander v. Gardner-*

*Denver Co.,* 415 U.S. 36, 47 (1974).  "This rule serves two purposes: affording an opportunity

for the EEOC to settle the dispute between the employee and the employer and putting the

employer on notice of the charges against it." *Harper,* 45 F.3d at 148, *citing Rush v. McDonald's*

*Corp.,* 966 F.2d 1104, 1110 (7th Cir. 1992). However, the Seventh Circuit "grants the Title VII

plaintiff significant leeway[.]" *Cheek v. Western & S. Life Ins. Co.,* 31 F.3d 497, 500 (7th Cir.

1994); *see Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.2d 164, 167 (7th Cir. 1976) (en

banc) ("This policy of being 'solicitous of the Title VII plaintiff' has been expressed by many

courts") (citations omitted).

The test for determining whether an EEOC charge encompasses the claims in a complaint

is a two-pronged test. *See Cheek,* 31 F.3d at 500; *see Harper,* 45 F.3d at 148.  Under the *Jenkins*

rule, "the complaint in the civil action may properly encompass any discrimination like or

reasonably related to the allegations of the charge and growing out of such allegations." *Jenkins,*

538 F.2d at 167; *see Murray v. Golden Rule Ins. Co.,* 23 F.Supp.3d 938 (S.D. Ind. 2014), *citing*

*Lloyd v. Swifty Transp., Inc.,* 552 F.3d 594, 602 (7th Cir. 2009) and *Jones v. Res-Care, Inc.,* 613

F.3d 665, 670 (7th Cir. 2010). "The test of *Jenkins* is satisfied if there is a reasonable relationship

between the allegations in the charge and the claims in the complaint, and the claim in the

complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Cheek,* 31 F.3d at 500; *see Novitsky v. American Consulting Engineers, L.L.C.,* 196 F.3d 699, 701-702 (7th Cir. 1999) *citing Babrocky v. Jewel Food Co.,* 773 F.2d 857, 864 n. 2 (7th Cir. 1985).

In *Novitsky v. American Consulting Engineers, L.L.C.*, the Seventh Circuit addressed the issue of whether the plaintiff was bound by an EEOC charge that failed to include a failure to accommodate claim when the plaintiff provided information about that claim to the EEOC in her intake questionnaire. 196 F.3d at 701-703; *see also Sickinger v. Mega Systems, Inc.,* 951 F.Supp. 153 (N.D. Ind. 1996).  The Seventh Circuit held that the plaintiff could not bring her failure to accommodate claim because: (1) "an accommodation claim would have been much easier to conciliate than [was] a claim of wrongful discharge[,]" 196 F.3d at 702 ("By making a wrongful-discharge claim and withholding a claim about one day's work, Novitsky frustrated the conciliation process"); (2) the EEOC did not refuse to accept the charge or misinform her that the intake questionnaire and the charge were the same thing, *Id.* ("Only the charge is sent to the employer, and therefore only the charge can affect the process of conciliation"); and, (3) the plaintiff "was accompanied by a lawyer when she signed the charge," *Id.* at 702-703; *see Rush,* 966 F.2d at 1112.

In her concurring opinion in *Novitsky*, Judge Rovner clarified that the majority opinion did *not* "decide whether an illiterate person or pro se person who signs a charge prepared by the EEOC, which leaves out critical information provided by the claimant to the EEOC in the intake questionnaire, would be similarly bound by the charge." *Id.* at 703; *see Wojtanek v. Pactiv LLC,* 492 F.App'x 650, 653 (7th Cir. 2012), *quoting B.K.B. v. Maui Police Dep't,* 276 F.3d 1091, 1101-1102 (9th Cir. 2002)); *see Vela v. Village of Sauk Village,* 218 F.3d 661, 664 (7th Cir.

2000); *see Jordan v. Whelan Security of Illinois, Inc.,* 30 F.Supp.3d 746, 751 (N.D. Ill. 2014); *see Brindley v. Target Corporation,* 761 F.Supp.2d 801, 805-806, 806 n.6 (N.D. Ill. 2011). "A number of courts have recognized that equitable considerations may require a court to look outside the formal charge where the employee has done all that she can to present the claim to the EEOC, particularly where the failure to include the allegations results from EEOC negligence or misinformation." *Id.* (citing cases).

The Seventh Circuit and district courts within this circuit have narrowed the holding in *Novitsky* to its facts, and courts continue to look beyond the four corners of the EEOC charge: "'[a]llegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the allegations.'" *Jordan,* 30 F.Supp.3d at 751 (citing *Swearnigen-El v. Cook Cnty. Sheriff's Dep't,* 602 F.3d 852, 865 (7th Cir. 2010) (quoting *Vela,* 218 F.3d at 664 (7th Cir. 2000)); *see also Sickinger,* 951 F.Supp. 153; *see Jackson v. Local 707, Int'l Bd. of Teamsters,* AFL-CIO, No. 95 C 7510, 2002 WL 460841, at *3 (N.D. Ill. Mar. 26, 2002); *see Finley v. Ill. Dep't of Public Aid,* 1998 WL 26156, at *5 (N.D. Ill. Jan. 12, 1998).

This Court recently allowed a plaintiff to bring a hostile work environment claim not included in her EEOC charge where she presented evidence that the claim was communicated in writing to the EEOC. *See Cain v. City of Muncie,* No. 1:13-cv-01127-SEB-MJD, ECF No. 76, *9-13 (S.D. Ind. May 4, 2015), *appeal docketed,* No. 15-2225 (7th Cir. June 4, 2015). In support of its ruling, the Court cited a number of cases that allowed claims to proceed because the plaintiffs made more than mere unverified assertions that allegations were orally communicated to the EEOC. *See Id.* at *10-12; *see Vela,* 218 F.3d at 665 n.2; *see also Carroll v. Yellow Freight Systems, Inc.,* 01 C 6755 (N.D. Ill. Sep. 23, 2003). The Court found that the plaintiff's EEOC intake questionnaire and a co-worker's affidavit provided to the EEOC "pointed to facts

11

supporting an inference that [the plaintiff] brought the sexual harassment allegations to the attention of the EEOC while attempting to file her charge." *Id.* (citing *Jackson,* 2002 WL 460841, at *3).

C.    **Discrimination Based on Race, Religion, and National Origin**

Under Title VII it is unlawful for an employer to discharge or otherwise discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, or national origin. 42 U.S.C. § 2000e-2(a)(1)); *see Stockwell v. City of Harvey,* 597 F.3d 895, 900-901 (7th Cir. 2010).  In order to win her discrimination claims at trial, Plaintiff must convince a trier of fact that Stoops fired her because she is Asian, because she is Chinese, or because she is Buddhist. *See Flores v. Preferred Technical Group,* 182 F.2d 512, 514 (7th Cir. 1999).  To survive Stoops' Motion for Summary Judgment, [Dkt. 42], Plaintiff must do one of two things. *See Id.* She can present direct evidence of Stoops' discriminatory intent or "she can use the indirect 'burden-shifting' approach approved by the Supreme Court in *McDonnell-Douglas v. Green*, 411 U.S. 792 (1973)." *Id.*

1.    **The Direct Method**

To survive summary judgment under the direct method, Plaintiff needs "to present either direct evidence of discriminatory intent (such as an admission) or enough circumstantial evidence to allow a rational jury to infer that discriminatory intent motivated [her] firing." *Burnell v. Gates Rubber Co.,* 647 F.3d 704, 708 (7th Cir. 2011) (citation omitted); *See Oest v. Illinois Dep't of Corr.,* 240 F.3d 605, 611 (7th Cir. 2011) (citing *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1397 (7th Cir. 1997)) (Plaintiff must put "in enough evidence… to create a triable issue of whether the adverse employment action… had a discriminatory motivation."). "Circumstantial evidence may include suspicious timing; ambiguous statements… and evidence

that similarly situated employees outside the protected class received systematically better treatment." *Burnell*, 647 F.3d at 708 (citing *Darchak v. City of Chicago Bd. of Educ.,* 580 F.3d 622, 631 (7th Cir. 2009). Under the direct method, Plaintiff "must establish her case through the Circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Adams v. Walmart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003); *See Oest,* 240 F.3d at 611 (citing *Robin v. Espo Eng'g Corp.,* 200 F.3d 1081, 1089 (7th Cir. 2000)) (direct or circumstantial evidence must be "related to the adverse employment action at issue.").

## 2.    The Indirect Method

Under the indirect approach, Plaintiff "must first establish, by a preponderance of the evidence, a prima facie case of employment discrimination." *Hong v. Children's Mem'l Hosp.,* 993 F.2d 1257, 1261 (7th Cir. 1993); *see Curry v. Menard, Inc.,* 270 F.3d 473, 477 (7th Cir. 2001); *see Peals v. Eli Lilly,* 5 F.Supp.3d 996, 1003 (S.D. Ind. 2014). "In discriminatory discharge cases… a plaintiff generally meets the prima facie burden if she establishes that '(1) she is a member of a protected class, (2) she was doing her work well enough to meet her employer's legitimate expectations, (3) despite her performance, she was discharged, and (4) her employer sought a replacement for her.'" *Flores,* 182 F.2d at 515 (citing *Hong,* 993 F.2d 1257 (7th Cir. 1993), citing *Villa v. City of Chicago,* 924 F.2d 629, 631 (7th Cir. 1991)); *see Curry,* 270 F.3d at 477 (to demonstrate a prima facie claim of employment discrimination, the plaintiff must prove that: (1) she belongs to a protected class; (2) she performed her job according to the defendant's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably); *see Burks v. Wisconsin Dep't of Transp.,* 464 F.3d 744, 750-751 (7th Cir. 2006) (a plaintiff is only required

to point to one other similarly situated employee not in the protected class who was treated more favorably than the plaintiff to satisfy the fourth element).

"Once a prima facie case is established, a presumption of discrimination is triggered." *Coleman,* 667 F.3d at 845. The burden then shifts to Stoops to articulate some legitimate, nondiscriminatory reason for its actions. *See Id.*; *Elkhatib v. Dunkin Donuts, Inc.,* 493 F.3d 827, 830 (7th Cir. 2007); *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 463 (7th Cir. 1986) (noting that the defendant's burden is a "burden of production … that is not difficult satisfy"). If Stoops "comes up with such a reason," Plaintiff "must be able to show a triable issue as to whether it is a mere pretext offered to mask the employer's true discriminatory animus." *Flores,* 182 F.2d at 514; *see Elkhatib,* 493 F.3d at 830; *Peals,* 5 F.Supp.3d at 1003. Evidence that undercuts Stoops' stated reason for its actions and other evidence that calls into question the honesty of Stoops' reason "presents a jury question as to pretext." *See Coleman,* 667 F.3d at 841-842.

### a.      The "Prima Facie Threshold"

"Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715 (1983). "[T]he prima facie threshold is no longer a relevant issue once the defendant has come forward with evidence of legitimate reasons for its actions that would rebut a prima facie showing of discrimination." *Jayasinghe v. Bethlehem Steel Corp.,* 760 F.2d 132, 135 (7th Cir. 1985); *See Debs,* 153 F.3d at 395-396.

### b.      Satisfaction of the Employer's Legitimate Expectations

Plaintiff must "establish, by a preponderance of the evidence, that [her] job performance satisfied the legitimate expectations" of Stoops. *Dale,* 797 F2d at 463.  "This factor envisions a

bifurcated inquiry, i.e., whether the employer's expectations were legitimate and if so, whether the employee was meeting those expectations." *Id.* "Although the inquiry into whether the employer's expectations were legitimate is a limited one, the court must determine whether the employer communicated those expectations to the employee and whether those expectations were unreasonable." *Id.* (internal and external citations omitted).  The "critical issue" with respect to the legitimate expectations prong of the prima facie test is whether the plaintiff "was performing well in her job at the time of her termination." *Hong,* 993 F.2d at 1262 (citation omitted).

The legitimate expectations prong of the prima facie test often "dovetails with the issue of pretext." *Vakharia v. Swedish Covenant Hosp.,* 190 F.3d 799, 807 (7th Cir. 1999); *see Curry,* 270 F.3d at 478.  Where only the second and fourth elements are at issue, those elements "merge when an employer applies its legitimate expectations in a discriminatory fashion and the analysis proceeds directly to pretext." *Peals,* 5 F.Supp.3d at 1003 (citing *Curry,* 270 F.3d 473 (7th Cir. 2001)).

### c.    Similarly Situated Co-Workers

Comparator evidence is "'[e]specially relevant' at the pretext stage." *Coleman,* 667 F.3d at 841 (citing *McDonnell-Douglas*, 411 U.S. at 804). Under Seventh Circuit precedents, Plaintiff "may demonstrate pretext by providing evidence that a similarly situated employee outside her protected class received more favorable treatment." *Coleman,* 667 F.3d at 841 ("When the same supervisor treats an otherwise equivalent employee better, one can often reasonably infer that an unlawful animus was at play.").

"The similarly-situated analysis calls for a 'flexible, common-sense' examination of all relevant factors." *Id.* at 846. "Similarly situated employees must be directly comparable to the

plaintiff in all material respects, but they need not be identical in every conceivable way." *Id.* (citations and quotations omitted). The Court must look "for comparators, not clones." *Id.* (citing *Chaney v. Plainfield Healthcare Center,* 612 F.3d 908, 916 (7th Cir. 2010) (quotations omitted). "So long as the distinctions between the plaintiff and the proposed comparators are not 'so significant that they render the comparison effectively useless,' the similarly-situated requirement is satisfied." *Id.* (citing *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 405 (7th Cir. 2007)).

"To offer a prima facie case of discrimination under the indirect method, the plaintiff's burden is 'not onerous.'" *Coleman,* 667 F.3d at 846 ("The Supreme Court 'never intended' the requirements 'to be rigid, mechanized, or ritualistic… [but] merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'"). Thus, "precise equivalence… between employees is not the ultimate question[;]" "[t]he touchstone of the [similarly-situated] inquiry is simply whether the employees are 'comparable.'" *Id.* (internal and external citations omitted). The question of whether a comparator is similarly situated is a question for the jury, *see Id.* (citing *Srail v. Village of Lisle,* 588 F.3d 940, 945 (7th Cir. 2009)), and summary judgment is *not* appropriate when reasonable jurors could find that a plaintiff has at least shown that the comparators: "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 846-847 (citing *Gates v. Caterpillar, Inc.,* 513 F.3d 680, 690 (7th Cir. 2008), quoting *Snipes v. Illinois Dep't of Corr.,* 291 F.3d 460, 463 (7th Cir. 2002)) (internal quotation marks omitted). This legal standard is not a "magic formula" and the "inquiry

should not devolve into a mechanical, "one-to-one mapping between employees." *Id.* at 847 (citing *Humphries,* 474 F.3d at 405).

### d.    Demonstrating Pretext

If Stoops can produce a legitimate, nondiscriminatory reason for its actions, the burden shifts back to Plaintiff to present evidence that Stoops' proffered reason is pretextual. *See Vakharia,* 190 F.3d at 806-807. In order to rebut Stoops' proffered explanation, Plaintiff must refute Stoops' specific explanations, and she must do more than challenge the judgment of her superiors through self-interested assertions. *See Dale,* 797 F.2d at 463-465, and n. 4 ("Plaintiff… must eliminate the most obvious legitimate reasons for the employer's actions – plaintiff's lack of qualification or the employer's lack of need – to establish that the employer was motivated by an illegitimate reason.").

"Pretext in this context means 'a lie, specifically a phony reason for some action.'" *Vakharia,* 190 F.3d at 807 (citation omitted). Evidence that shows an employer was more likely than not motivated by a discriminatory reason establishes pretext. *Id.*; *see Dale,* 797 F.2d at 464. Evidence that shows an employer's explanation is not worthy of credence, i.e., that shows the explanation was factually baseless, was not the employer's actual motivation, or was an insufficient rationale for the employer's action, establishes pretext. *Id.* (citing *Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 983 (7th Cir. 1999) and *Debs,* 153 F.3d at 395-396).

Positive evaluations from the employee's personnel file and statements of independent third parties to the effect that the employee's performance was adequate are specific examples of such evidence. *See Dale,* 797 F.2d at 464. Where the employee's own affidavit or deposition testimony is the only evidence submitted by the plaintiff to refute an employer's proffered explanation, courts will not "delve into the question of which portrayal is the correct one." *Id.*

As a rule, the court will "'not sit as a super-personnel department that reexamines an entity's business decisions' in cases where discrimination is alleged." *Vakharia,* 190 F.3d at 807 (citing *Dale,* 797 F.2d at 464). The question is not whether the defendant-employer exercised prudent business judgment, but whether the plaintiff-employee has come forward to refute the articulated, legitimate reasons for her discharge. *See Dale,* 797 F.2d at 464. In answering this question, "[t]he employee's perception of herself … is not relevant. It is the perception of the decision maker which is relevant." *Id.* at 464-465 (citing *Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir. 1980)). The court's ultimate task, then, "is to determine 'whether the employer gave an honest explanation of its behavior.'" *Debs,* 153 F.3d at 396 (citing *Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557, 560 (7th Cir. 1987); *see Wolf,* 77 F.3d at 920 ("There may be cases in which the multiple grounds offered by the defendant for the adverse action of which the plaintiff complains are so intertwined, or the pre-textual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment.").

### D. Intentional Infliction of Emotional Distress

To prove a claim of intentional infliction of emotional distress, Plaintiff must establish that Trauner (1) engaged in extreme and outrageous conduct (2) which intentionally or recklessly (3) caused (4) severe emotional distress to the plaintiff. *Shifrin v. Liberty Mutual Insurance,* 991 F.Supp.2d 1022, 1047 (S.D. Ind. 2014) (citing *Curry v. Whitaker,* 943 N.E.2d 354, 361 (Ind. Ct. App. 2011). On summary judgment, Plaintiff must put forth evidence showing that Trauner acted with an intent to harm Plaintiff emotionally, or recklessly did so. *Shifrin,* 991 F.Supp.2d at 1047. There must be evidence of wrongdoing and wrongdoing that is intentional. *Id.*

## III. STATEMENT OF MATERIAL FACTS IN DISPUTE

1.       Plaintiff has eight years of employment experience in accounting and payroll with two different Chinese companies.  Ella Sun Martin Dep. 26:7-15; 28:2-5; 28:21-25; 29:17-18; 42:3-46:21; 48:9-15 (July 27, 2014).

2.       Plaintiff also has six years of university level education in accounting with a bachelors of science degree in accounting. *Id.* at 18:2-19:11; 19:9-11; 19:12-20:1; 22:5-9; 23:18-26:6; 34:7-11; 37:10-14; 39:14-41:8; 40:8-10; 48:21-49:18

3.       Plaintiff began her employment as a preschool teacher with KinderCare on September 2, 2008. *Id.* at 30:23-31:1.

4.       Plaintiff also developed a proficiency in numerous computer software packages highly useful in the field of payroll and accounting. *Id.* at 50:8- 51:14.

5.       Trauner, Stoops' Office Manager, had the sole authority to hire and fire applicants for positions in her department. Debra Trauner Dep. 23:5-7 (Oct. 29, 2014).

6.       Trauner decided to interview Plaintiff for the position because of "[Plaintiff's] education in accounting." *Id.* at 31:24-32:1.

7.       Trauner interviewed Plaintiff on four separate occasions at Trauner's office over the course of four months. Martin Dep. 52:24-53:24; 57:24-58:17. Trauner had no problems communicating with Plaintiff during the interviews. *Id.* at 42:4-14.

8.       Even though Plaintiff did not have experience with the ADP[1] payroll system used by Stoops, *see* Trauner Dep. 48:4-11; 52:10-14, Trauner believed that Plaintiff's education, skills, and experience qualified Plaintiff for the position. *Id.* at 38:18-24; *see Id.* at 47:23; *see*

---

[1] "ADP" stands for "Automated Data Processing. It is [Stoops'] dealer management computer system." ADP "has all of [Stoops'] business on it, the check writing, cash receipts, service invoicing, parts invoicing, inventories, vehicles and parts" and the general ledger. Trauner Dep. 27:13-28:1.

Dkt. 43 at 4 (where the Defendants admit that Martin was the only Stoops office department employee with an accounting degree).

9.      Plaintiff accepted Stoops' offer of employment and started the part-time Payroll Accountant position on March 28, 2012. *Id.* at 87:1-3; 88:9-11; 88:21-23; *see* Exhibit A, Stoops' Martin New Hire Employee Information Sheet (Mar. 28, 2012). Stoops' office department employees referred to Plaintiff's position as the "Payroll Clerk" and her job responsibilities were "[t]o do the payroll… [j]ust to do the payroll."[2] Linda Robinson Dep. 16:16-22, 18:6-9 (Jan. 7, 2015); Julie Fredbloom Dep. 17:5-7 (Jan. 14, 2015); Carole Schrage Dep. 16:24-17:2 (Jan. 7, 2015); Jennifer Mazura Dep. 14:6-13 (Jan. 8, 2015). Plaintiff's part-time schedule was Wednesday through Friday from 8:00 p.m. to 5:00 p.m. each week. Martin Dep. 87:21-88:4. Plaintiff's KinderCare supervisor let Plaintiff change her schedule to 8-hour shifts on Mondays and Tuesdays each week to continue her employment there. Martin Dep. 87:1-18.

10.     Before hiring Plaintiff, Trauner hired Sherry Rowland ("Rowland") for Stoops' HR position. Trauner Dep. 141:11-25; Sherry Rowland Dep. 8:1-16 (Jan. 14, 2015); Martin Dep. 83:21-84:8; Robinson Dep. 29:12-17. Rowland held the HR position until September 2013. Rowland Dep. 7:14-8:5; *see* Trauner Dep. 82:16-83:6.

11.     Trauner hired and supervised the following office department employees in addition to Plaintiff and Rowland: Linda Robinson ("Robinson), Carole Schrage ("Schrage"), Diana Nance ("Nance"), Jennifer Mazura ("Mazura"), Julie Fredbloom ("Fredbloom"), and Dawn Roush ("Roush"). Robinson Dep. 11:22-12:11, 15:5-7; Rowland Dep. 8:13-16, 10:19-25, 11:7-19; Schrage Dep. 7:19-22, 8:22-24, 14:24-15:4; Mazura Dep. 8:24-9:8, 9:12-17, 22:6-9;

---

[2] Because Trauner and Stoops' office department employees and department managers called Plaintiff's job title the "Payroll Clerk" position, Plaintiff will hereinafter refer to the Plaintiff's job title, or that job title as previously or subsequently held by any other person, as the "payroll clerk" position.

Fredbloom Dep. 8:1-10:3, 14:2-7, 26:22-24; Dawn Roush Dep. 8:22-9:7, 11:13-20 (Jan. 14, 2015).

12.     At the start of her employment, Stoops did not give Plaintiff the Stoops Employee Handbook. Trauner Dep. 56:14-58:4; Martin Dep. 122:22-20, 196:23-197:22; *see* Exhibit B, Stoops' Martin New Hire Checklist (Mar. 28, 2012); *see* Exhibit C, Stoops' Martin Employee Orientation Report (Undated). Stoops did not tell Plaintiff about the grievance procedures for harassment and discrimination. Martin Dep. 122:3-124:16; Rowland Dep. 33:20-23.

13.     Trauner did not give Plaintiff her Office Department Employees' Job Duties Spreadsheet. Trauner Dep. 14:25-16:1; *see* Exhibit D, Stoops' Office Department Employee Job Duties List.   Trauner gave the job duties spreadsheet to all other former and current office employees except Roush. Trauner Dep. 16:2-17:9; Schrage Dep. 10:14-23; Rowland Dep. 13:11-25; Mazura Dep. 16:7-17:22; Fredbloom Dep. 17:19-19:25; Roush Dep. 17:5-18:5; Luanne Miller Dep. 19:17-20:13 (Jan. 8, 2015); Lisa Goodin Dep. 50:8-51:3 (Jan. 8, 2015).  Trauner did not revise the spreadsheet or give updated versions to most office employees, including Plaintiff. Robinson Dep. 31:3-9; Schrage Dep. 10:4-11:23; Rowland 14:14-16:1; Mazura Dep. 16:7-17:19; Fredbloom Dep. 17:19-18:22; Roush Dep. 17:22-18:5.

14.     Trauner trained Plaintiff on the ADP as needed. Trauner Dep. 52:15-22. She did not require Plaintiff to know all of the programs in ADP. *Id.* at 53:18-21. She required Plaintiff to be able to obtain information from the ADP accounting program. *Id.* at 54:4-14.  It did not take Trauner very long to train Plaintiff on ADP. *Id.* at 54:17-21. Plaintiff did very well learning ADP and was competent with ADP after 90 days. *Id.* at 56:7-13.

15.     Robinson was the Assistant Office Manager during Plaintiff's employment. Robinson Dep. 16:9-15. Robinson watched the eight office employees to insure they were

working and fielded questions, if necessary. *Id.* at 17:5-12. Robinson says Plaintiff never had questions or needed her help. *Id.* at 17:13-17.

16.    Robinson never saw Trauner train Plaintiff because Trauner frequently took Plaintiff to her office and closed the door. Robinson Dep. 22:3-12; Martin Dep. 103:6-7.

17.    Sometimes Trauner required department employees to perform tasks outside of their assigned job functions. Robinson Dep. 19:23-20:15; Rowland Dep. 17:18-18:18; Martin Dep. 99:18-100:16.  Trauner started assigning Plaintiff non-payroll duties in May 2012. Martin Dep. 99:18-102:1.

18.    In early May 2012, Plaintiff told Nance that her daughter was going to be baptized and asked Nance to explain to her what baptism meant. Martin Dep. 102:23-103:3. Nance explained to Plaintiff what baptism meant. *Id.* at 103:4; *cf.* Trauner Dep. 58:10-23.

19.    Trauner overheard this conversation, and called Plaintiff into her office the following week. Martin Dep. 103:5-104:7, 106:10-16; Trauner Dep. 58:12-15. Behind closed door, Trauner asked Plaintiff if she read the Bible or went to church, and asked if she wanted help understanding the meaning of Christian baptism. Trauner Dep. 59:24-60:2.  Plaintiff said she was not interested in the Bible or going to church because she is a Buddhist. Martin Dep. 103:17-104:7, 113:21-114:4, 117:4-17. Plaintiff told Trauner she did not want Trauner to help her understand her daughter's baptism, and Plaintiff never asked Trauner for help or asked Trauner any questions about Christianity, baptism, etc. *Id.* at 112:20-113:5; Trauner Dep. 61:10-18, 63:19-64:2. The first time Trauner raised the issues of the Bible, church, and Christianity, Plaintiff did not think it was a "big deal." Martin Dep. 114:12-17. Later on Plaintiff thought that it was a big deal because it was "actually the incident that – the beginning of the incident[;]" i.e., Plaintiff's termination eight months later on February 25, 2013. *Id.* at 115:6-13.

20.     Every Thursday and Friday after Trauner overheard Plaintiff's conversation, Trauner instructed Plaintiff to come to her office to work or to receive training. *Id.* at 107:18-108:2; Trauner Dep. 60:12-14. Before Plaintiff's conversation with Nance, Plaintiff did not work or receive training in Trauner's office "that often." Martin Dep. 109:7-8.   After Trauner overheard the conversation, Plaintiff was in her office "very often." *Id.* at 109:7-10, 130:13-14.

21.     During the time Plaintiff was in Trauner's office, Trauner would raise topics such as church, baptism, the Bible, and Christianity, and ask Plaintiff to read the Bible with her. Trauner Dep. 60:14, 60:19-20. Trauner wanted Plaintiff to "stay on Thursday evenings immediately after work and read the Bible." *Id.* at 60:16-18.   Trauner wanted to help Plaintiff understand Christianity at the workplace because Trauner had "[c]ompassion for another individual." *Id.* at 75:1-4. Trauner wanted Plaintiff to read the Bible with her because she wanted Plaintiff to understand Christianity. *Id.* at 58:24-59:7. Trauner wanted Plaintiff to read the Bible with her because "the Bible tells the story… [o]f Christianity… It tells about God, and it tells about Jesus." *Id.* at 65:7-14.   Trauner believes that the Bible is inspired by God; that the Bible is the word of God; that the Bible speaks to people about God's will in this world; and, that the Bible speaks for itself. *Id.* at 76:23-77:10. Trauner believes that when people die, they either go to heaven or hell. *Id.* at 131:6-9. In order to go to heaven when a person dies, Trauner "believe[s] they need to confess and be baptized… [confess t]hat Christ is their savior… He's the son of God, and he is your savior." *Id.* at 131:10-20, 132:4-7.   Trauner thinks that Jesus Christ is "our salvation" and Trauner wanted Plaintiff to find salvation through Jesus Christ. *Id.* at 66:10-22. Trauner's personal religious beliefs about God and Jesus motivated her decision to "help" Plaintiff. *Id.* at 136:18-137:10.

22.     Stoops expressly forbids employees from soliciting other employees "for any purposes during working time. In addition, distribution of literature of any kind is prohibited at any time in working areas." *See* Exhibit E at 20, Stoops Buick Employee Handbook (rev. July 2005).

23.     Trauner researched and printed off religious literature about Plaintiff's daughter's church. Trauner Dep. 61:10-13; Martin Dep. 117:9-11, 118:7-120:19, 121:15-122:21. Trauner found the church's website and printed a picture from the website containing the church's contact information. Trauner Dep. 61:19-21. Trauner gave it to Plaintiff hoping that Plaintiff would contact the church. *Id.* at 61:22-24. Plaintiff never visited the church's website. Martin Dep. 119:24.

24.     Trauner also made Plaintiff a bookmark with a Bible verse on it, probably John 3:16. Trauner Dep. 62:11-21; Martin Dep. 117:21-118:6. Plaintiff threw away the bookmark. Martin Dep. 222:5-7.

25.     Trauner also told Plaintiff to read the Bible because it would help Plaintiff have a better understanding of American culture and be a better fit in American society. Martin Dep. 117:12-17.

26.     Trauner's actions shocked Plaintiff because Plaintiff had already told Trauner that she was not interested in Jesus or Christianity, but Trauner kept trying to convert Plaintiff to the Christian faith. Martin Dep. 119:12-21, 120:12-25; Trauner Dep. 66:10-22.

27.     Plaintiff was the only non-Christian employee in Stoops' office department. Rowland Dep. 38:1-2; Mazura Dep. 23:10-13; Fredbloom Dep. 37:11-13; Roush Dep. 36:20-24; Trauner Dep. 131:10-20, 132:4-7.

28.     Plaintiff was the only non-white, non-American born employee in the office department. Rowland Dep. 43:11-22; Mazura Dep. 23:2-9; Fredbloom Dep. 36:17-37:4; Roush Dep. 37:8-17; James Myers Dep. 25:2-5 (Jan. 7, 2015). She is the *only* non-Caucasian, non-American born individual who has ever been employed in the office department. Robinson Dep. 108:2-5; Miller Dep. 24:16-24; Goodin Dep. 49:11-22.

29.     Plaintiff was the only non-white, non-American born employee at the entire dealership during her employment. Mazura Dep. 20:14-20; Robinson Dep. 107:1-12; Schrage Dep. 19:4-20:5; Roush Dep. 29:9-32:2; Fredbloom Dep. 37:5-39:10; Myers Dep. 25:2-27:20.

30.     Trauner never talked to any current or former office employee about Christianity; never asked any current or former office employee to attend church with her; never brought any current or former office employee religious literature or items; and, never asked any current or former office employee to participate in Bible meetings of any kind. Trauner 73:10-17; Schrage Dep. 18:20-19:3; Roush Dep. 23:13-22; Fredbloom Dep. 29:18-30:1; Rowland Dep. 37:7-9, 38:23-39:1; Robinson Dep. 101:18-23, 102:6-10; *see* Miller Dep. 23:10-24:11. However, Trauner once raised the topic of Christianity with Rowland. Rowland Dep. 35:2-14, 38:7-22.

31.     During Plaintiff's employment, James Myers, Stoops' General Manager, led daily Bible and prayer meetings at the dealership. Myers Dep. 37:25-38:11; Mazura Dep. 23:14-24:25; Rowland Dep. 33:24-35:1; Fredbloom Dep. 34:20-35:25; Roush Dep. 32:3-36:27; James Jarvis Dep. 36:1-5 (July 17, 2015).  Myers "[r]ead something out of the Bible," and prayed for people. Myers Dep. 38:5-8. Myers and Stoops employees also "pray[ed] for the financial wellbeing of the dealership." *Id.* at 38:8-9. Myers knows "absolutely nothing about Buddhism" and "couldn't care less" about Buddhism. *Id.* at 60:10-14.

32.     Stoops expressly forbids "use [of] the building or any of its facilities for personal use after business hours unless specific written permission is granted by the company." Stoops Buick, Inc. Dep. 102:2-11 (Debra Trauner; July 17, 2015); *See* Ex. E at 17; *see* Myers Dep. 59:17-60:9. Trauner never requested and the company never granted Trauner specific written permission to use the Stoops premises for Bible studies with Plaintiff. Stoops Dep. 102:12-15. Trauner instructed Plaintiff to keep the Bible meetings a secret, and Trauner never disclosed that the Bible meetings were occurring or had occurred to anyone else. Stoops Dep. 102:2-5.

33.     On June 28, 2012, Plaintiff completed Stoops' 90-day introductory employment period, and Trauner gave Plaintiff an extremely positive 90-day written performance review. *See* Exhibit F, Stoops' Martin Ninety-Day Performance Review (June 28, 2012); *see* Ex. E at 5-6. Trauner's 90-day review states, among other things, that Plaintiff "brings a great deal of skill and experience with her[;]" "I am able to trust that any project I give Ella will be completed[;]" "She makes herself available for new tasks when time allows. Ella's strong skills with Microsoft Exel [sic] are a very welcome addition to our staff[;]" "Ella is an excellent addition to our staff and company☺". *See* Ex. K.

34.     From June 28, 2012 to February 25, 2013, Stoops did not give Plaintiff another written or verbal job performance review, and never warned or reprimanded Plaintiff verbally or in writing regarding her job performance. *See* Ex. E at 28-29.

35.     In early July 2012, Trauner informed Plaintiff that Stoops would be expanding its operations and that a full-time payroll accountant position would be opening "by the end of August [2012]." Trauner Dep. 72:7-20. Trauner showed Plaintiff where the new administration office would be and asked Plaintiff if she wanted to move to a full time position. *Id.* at 72:7-20. Plaintiff said yes. Martin Dep. 155:16-156:13. Trauner then asked Plaintiff to read the Bible with

her and implied that if Plaintiff did not read the Bible with Trauner, Plaintiff would not be offered the full-time position. Martin Dep. 156:5-9, 157:13-15. Because of that implication and fearing displeasing Trauner, Plaintiff said she would read the Bible with Trauner. Martin Dep. 157:9-25, 315:12-24, 316:4-5; Trauner Dep. 60:16-18, 64:6-10.

36.     Trauner told Plaintiff that they would have their Bible meetings in Stoops' conference room on Thursday evenings from 5:00 p.m. to 7:00 p.m. after Plaintiff clocked out because "Mr. Myers will not be there." Martin Dep. 160:6-161:5; Trauner Dep. 78:10-12; Myers Dep. 53:20-23. Each Thursday from July 2012 to September 20, 2012, Trauner had Plaintiff clock out at 5:00 p.m. and from 5 o'clock to 7 o'clock caused Plaintiff to "[take] turns reading Bible verses[,]" starting "at…Genesis 1." Trauner Dep. 64:20-21; Martin Dep. 159:4-162:15; *see* Dkt. 1 at 23(b). Trauner "talked about the verses and what they might have meant." Trauner Dep. 66:7-9; Martin Dep. 317:15-318:10; *see* Dkt. 1 at 23(a). Trauner sang Christian songs to Plaintiff and during one of the Bible meetings Trauner made Plaintiff sing the song "Jesus Loves Me." Martin Dep. 318:11-19; *see* Dkt. 1 at 23(d). Trauner made Plaintiff read verses despite Plaintiff's inability to pronounce words so that Trauner could correct Plaintiff's pronunciation of words. *Id.* at 117:12-17, 318:3-5; Dkt. 1 at 23(c). Trauner told Plaintiff not to tell anyone about the Bible meetings because it was "personal," and there was no reason to tell any other person about the Bible meetings. Trauner Dep. 68:14-22; Martin Dep. 177:8-16. Only Nance was aware that Trauner was having Bible meetings with Plaintiff. Trauner Dep. 68:14-22; Rowland Dep. 37:10-22; Fredbloom Dep. 29:3-7; Roush Dep. 21:5-25; Myers Dep. 59:14-60:1, 60:2-9; Robinson Dep. 14:8-15; Martin Dep. 209:13-211:1.

37.     On July 13, 2012, Trauner offered Plaintiff additional part-time hours for 2-4 hours per day on Monday and Tuesday each week. Martin Dep. 152:9-154:15; *See* Exhibit G,

Trauner Email to Martin (July 13, 2012). Plaintiff did not ask Trauner for the additional hours. Martin Dep. 181:1-5. Plaintiff told Trauner she wanted the additional hours but needed to submit submitted a two-week notice of resignation to KinderCare first, and Trauner agreed. *Id.* at 152:9-154:15*; see* Exhibit H, Martin Two-Week Notice Resignation Letter to KinderCare (July 18, 2012).  Plaintiff delivered her resignation letter to KinderCare on July 18, 2012. *Id.* at 153:9-14. The same day Plaintiff sent her two-week notice to KinderCare, Trauner emailed Plaintiff: "I later thought about it and didn't know if you wanted to continue at KinderCare until I can offer full time here?" *See* Ex. G. Plaintiff's last day at KinderCare was July 31, 2012. Martin Dep. 153:7-154:14.

38.     After the Bible meetings started in July, Plaintiff obtained a copy of Stoops' Employee Handbook. *Id.* at 124:9-125:2.  Plaintiff's husband read the anit-harrassment and anti-discrimination policies and told Plaintiff he thought Trauner's bible meetings violated the law. *Id.* at 125:3-4. Plaintiff wanted to keep her job and disagreed with her husband's opinion. *Id.* at 127:14-16. Plaintiff did not complain to Myers about Trauner's actions because Trauner told her that the Bible meetings were strictly confidential between the two of them. *Id.* at 127:5-11, 177:8-16.

39.     In early September 2012, Plaintiff observed that the building expansion was not finished and that no full-time payroll position was available. *Id.* at 161:2-10. Plaintiff was also irritated that she resigned from KinderCare only to receive four to eight *total* additional hours from August 1, 2012 to early September 2012. Martin Dep. 181:22-183:3; *see* Exhibit I, Stoops' Martin Payroll Register (March 30, 2012 – March 15, 2013).

40.     But Plaintiff feared telling Trauner that she did not want to continue the Bible readings. Martin Dep. 161:7-10. So Plaintiff enrolled her daughter in afterschool activities and

told Trauner that she had to end the Bible meetings to attend her daughter's karate classes on Thursday evenings. *Id.* at 161:10-22; Trauner Dep. 67:15-19. Trauner "was very upset[,]" and suggested that they read the Bible on Friday evenings. Martin Dep. 161:23-24. Plaintiff negated the suggestion because she wanted to spend Fridays with her family. *Id.* at 161:25-162:2.

41.     The last Bible meeting occurred on Thursday, September 13, 2012. *Id.* at 162:14-16, 175:1-23. From that point forward, Trauner continued to pressure Plaintiff to read the Bible with her until she terminated Plaintiff. Martin Dep. 278:19-279:25.

42.     After Plaintiff ended the Bible meetings, Trauner assigned Plaintiff additional non-payroll duties. *Id.* at 100:5-16; Robinson Dep. 71:1-5. Trauner had Plaintiff start helping her with bank reconciliation and employee accounts receivable. Martin Dep. 134:23-135:1. Plaintiff's part-time schedule and additional job assignments did not impact her job performance. *Id.* at 137:4-13.

43.     Plaintiff made two total mistakes during the entire period of her employment. *Id.* at 137:19-144:20; Robinson Dep. 33:9-36:22. Plaintiff entered all payroll data on Wednesdays and balanced the general ledger every Thursday morning. Martin Dep. 139:15-22. Plaintiff balanced the general ledger on Thursdays in search of errors not discovered during payroll entry on Wednesday.[3] *Id.* at 139:22-25. This setup allowed Plaintiff to correct any payroll errors before check processing on Fridays. *Id.* at 140:1-3.

Plaintiff discovered that she forgot to enter Trauner's payroll data on the Wednesday in question, and contacted Trauner immediately. *Id.* at 140:5-8. Trauner told Plaintiff she would contact Paylocity and then tell Plaintiff how she wanted Plaintiff to correct the error. *Id.* at 140:9-22. After Plaintiff finished the payroll general ledger on Thursday, and before entering the

---

[3] One of the payroll clerk's job duties is simply to find errors and then correct them. Robinson Dep. 30:18-23; Goodin Dep. 47:12-49:10.

payroll ledger into ADP, she had to submit the general ledger to Trauner for approval. *Id.* at 140:24-141:1. Plaintiff told Trauner that since she forgot to enter Trauner's payroll into ADP on Wednesday, Trauner's account balance on the payroll general ledger was zero. *Id.* at 141:1-3. Plaintiff told Trauner she would pay her double the following week to correct the error, and Trauner approved Plaintiff's proposed correction. *Id.* at 141:5-10. The next week Plaintiff paid Trauner double. *Id.* at 141:10-11. However, Stoops paid Trauner three times for the week in question. *Id.* at 141:12-18. Trauner did not address or tell Plaintiff about the triple payment of September 2012 until mid-January 2013. *Id.* at 142:8-13, 144:21-22. At the meeting when Trauner addressed the issue, Plaintiff discovered that the triple payment occurred because Trauner contacted Paylocity the same Thursday that Trauner directed Plaintiff to pay her double the following week, and Trauner never told Plaintiff that she contacted Paylocity and received a direct deposit the next day (Friday). *Id.* at 141:19-144:22; 143:20-23; 143:25-144:2.  Plaintiff further discovered that Trauner manipulated the payroll general ledger in ADP to cover up what Trauner had done. *Id.* at 142:15-144:20; *see* Mazura Dep. 11:9-22.

44.    The second mistake possibly attributable to Plaintiff occurred in July 2012 when Stoops' Sales Manager, James Jarvis ("Jarvis"), emailed Plaintiff a computer file containing a sales commission sheet that Jarvis mistakenly dated for the previous week. *Id.* at 148:11-149:6. The previous week Plaintiff saved Jarvis' computer file to her own computer, and when Jarvis sent the computer file the next week Plaintiff saved Jarvis' file to her computer. *Id.* When Plaintiff opened Jarvis' file for payroll entry for the week in question, she opened the file containing Jarvis' sheet for the previous week because she saved Jarvis' email file attachments to her computer under the name Jarvis gave the files, and both files had the same file name. *Id.* Plaintiff caught the error before checks were processed, and Plaintiff and Trauner made timely

corrections. *Id.* at 149:7-16; Trauner Dep. 18:8-18. This occurred only one time and there were never other times when employees complained to Plaintiff about errors in their checks, and Plaintiff was not made aware of any incidents where employees went straight to Trauner about errors with their checks. *Id.* at 149:17-150:2.

45.     In any event, Stoops did not fire Plaintiff because of any perceived payroll errors or mistakes she made during the course of her employment. Stoops Dep. 104:16-19 (Aug. 20, 2015).

46.     Trauner often blamed office employees for errors that Trauner caused. Rowland Dep. 42:2-5.  Trauner would make changes, forget she made them, or fail to tell her employees. *Id.* at 42:2-8.  Rowland believes that Trauner was responsible for Trauner's triple payment because similar things happened to her and other office workers. *Id.* at 43:2-10. Plaintiff and her co-workers were frustrated by Trauner's omissions. *Id.* at 17:10-17; 18:10-20:1.

47.     Mazura cashiered, operated the phones, took complaints, handled the sales department's fuel cards, and took deposits on vehicles. Mazura Dep. 9:1-4, 17:9-19. She likely calculated timecards for payroll. *Id.* at 12:3-4. Mazura made mistakes in the performance of her job duties. *Id.* at 25:4-14. Mazura totaled cash drawers incorrectly, mishandled phone operations, and submitted petty cash monthly reports containing errors. *Id.* at 25:10-12; 27:4-28:6. Mazura never received a negative performance review or an adverse employment action for making mistakes. *Id.* at 26:2-4. Mazura was not aware of any issues related to Plaintiff's job performance. *Id.* at 15:3-6.

48.     Robinson made mistakes, too. Robinson Dep. 38:11-20, 55:7-11. She repeatedly shorted a Stoops employee's paycheck, failed to reconcile bank statements, and confused schedules. *Id.* at 38:22-24; 50:10-21; 64:5-24; 68:1-14; 73:8-14. Stoops did not terminate

Robinson for making job errors. *Id.* at 9:11-10:1; 12:6-11. Robinson has not likely suffered an adverse employment action because of her mistakes. *Id.* at 12:12-15. Robinson assessed Plaintiff's job performance as acceptable, and was "surprised" that Trauner terminated Plaintiff because she "just didn't know of any problems." *Id.* at 103:11-24; 105:6-14; 106:3-7. Robinson recalled a time when Trauner assigned Plaintiff a non-payroll task. *Id.* at 104:3-12. Plaintiff did not refuse to do the assignment, but expressed frustration and told Trauner she though she was hired to do payroll. *Id.*; *see* Goodin Dep. 51:12-16. After she was terminated, Plaintiff asked Robinson to write a job recommendation letter for her. *Id.* at 108:6-109:6; *see* Exhibit J, Robinson Email to Martin (September 16, 2013).  At first Robinson agreed, but then changed her mind because her allegiance is to Stoops and Trauner. *Id.* at 109:7-13; *see* Mazura Dep. 22:3-5 (where Mazura expresses her loyalty to Stoops).

49.     Fredbloom was the Title Clerk. Fredbloom Dep. 12:14-19. She submitted payroll sheets for the sales drivers and did wholesale billing. *Id.* at 12:5-13:1. Fredbloom made errors while performing her job. *Id.* at 33:17-34:15. She transposed numbers and wrote the wrong state name on car titles. *Id.* Fredbloom has not suffered an adverse employment action for making mistakes. *Id.* at 34:16-19.

50.     Rowland did payroll schedules, standard entries, checks for contributions, processed service department invoices, assisted with title work, balanced the GM parts statement, relieved Mazura on the cash register and phones, and entered new hires and employee health insurance and benefits information into payroll. Rowland Dep. 14:14-16:3. Her HR duties changed and were not well-defined. *Id.* at 17:5-8, 18:1-9. Rowland brought this to Trauner's attention but "it didn't get anywhere." *Id.* at 20:2-15.  Myers also disregarded her. *Id.* at 20:16-21:14.  Rowland committed job errors. *Id.* at 40:21-23. She miscalculated numbers and failed to

turn in assignments on time. *Id.* at 40:24-41:5. Trauner addressed Rowland's errors and may have reprimanded her once. *Id.* at 41:10-25. Stoops did not terminate Rowland for making mistakes. *Id.* at 14:4-10, 26:25-26:4, 27:22-23.  Two days before firing Plaintiff, Trauner told Myers she would give Rowland another chance to prove she could perform HR duties. *See* Exhibit K, Trauner Email to Myers (Feb. 23, 2013, 11:19 AM). Plaintiff's termination shocked Rowland. *Id.* at 24:10-11. Rowland, Roush, Mazura, and Nance learned that Plaintiff was allegedly fired "for not doing her job to her fullest capabilities" and for "making mistakes." *Id.* at 23:13-25:16. Rowland and Roush didn't believe that was the reason Plaintiff was fired. *Id.* at 23:13-21. Rowland did not believe that was the actual reason because she had seen Plaintiff's completed work assignments and personally observed Plaintiff's work ethic. *Id.* at 24:17-25:2. Rowland has a personal knowledge of Plaintiff's work because a few HR duties overlapped with payroll. *Id.* at 26:9-16.

51.     Roush scanned and archived files into ADP, and filed hard copies of payables. Roush Dep. 18:24-20:4. Roush made mistakes, as well, but never suffered an adverse employment action as a result of her mistakes. *Id.* at 27:3-28:12.

52.     Schrage was responsible for Accounts Receivable and Accounts Payable. Schrage Dep. 7:19-8:6. She compiled and balanced the service department's accounts receivable, billed customers for extended service warranties, and paid the company's bills. *Id.* at 10:4-14:4. Nance did retail billing, car deal billing, and reconciled accounts for the sales department. Fredbloom Dep. 12:19-13:1; Schrage Dep. 12:21-13:10. Two days before she fired Plaintiff, Trauner told Myers that "Diana [Nance] is getting older and her attitude is getting old too if you know what I mean." *See* Ex. K.  Trauner decided to try and "re-inspire" Nance rather than take any adverse employment action against her. Id. Nance left Stoops voluntarily because she had cancer and

Stoops refused to make her requested work accommodations. Rowland Dep. 39:23-40:20; *cf.* Ex. P.

53.     On May 22, 2015, Trauner said she asked Jarvis about his payroll reporting process prior arriving at her deposition. Stoops Buick, Inc. Dep. 23:18-33:17 (May 22, 2015); *see* Stoops Buick, Inc. Dep. 10:6-12 (July 17, 2015). Jarvis denied this. Jarvis Dep. 6:1-10.

54.     Myers testified that when he handed out payroll checks to sales employees each Friday, he received weekly complaints that *Plaintiff* made errors in their pay. Myers Dep. 31:25-37:17.  Likewise, Jarvis denies ever seeing this occur. Jarvis Dep. 11:10-12:5, 14:13-15:5.  Jarvis said if a sales employee complained about their pay, they complained to him and then he directed them to Trauner. Jarvis Dep. 13:6-15; Robinson Dep. 36:8-22.

Jarvis did not know who to send the payroll to when Plaintiff was the payroll clerk. Jarvis Dep. 15:6-18.  Jarvis could not locate all of the payroll emails he sent to Plaintiff because he deleted them. *Id.* at 15:19-24. Following Plaintiff's termination, Jarvis never received any written or verbal notice of a litigation hold on documents potentially relevant to this case. *Id.* at 16:8-21. Jarvis may have sent incorrect sales commission sheets to Plaintiff. *Id.* at 16:1-9; *see* Goodin Dep. 48:21-25. Jarvis did not place dates on the actual sales commission sheets that he sent to Plaintiff, but he did place dates on the computer files that he sent to Plaintiff. *Id.* at 29:8-30:15. Jarvis gave new sales employees county of residence and withholding exemptions forms to fill out and gave them to Rowland because she was HR. *Id.* at 15:22-25; 35:15-19; Rowland Dep. 15:16-18.

55.     Two months before Trauner terminated Plaintiff, Rowland heard Plaintiff tell Trauner that she was Buddhist and Trauner respond by explaining her Christian beliefs. Rowland Dep. 35:18-37-6, 50:5-51:11. Rowland characterized the conversation as "uncomfortable" and

unfriendly, and thought that it was inappropriate for work just like the prayer circles. *Id.* at 52:2-23; Martin Dep. 117:7-17; 120:15-19; Trauner Dep. 73:22-75:8.

56.    Trauner continued to ask Plaintiff to read the Bible with her in October, November, and December of 2012. Martin Dep. 162:14-162:21, 320:1-3. Because Trauner did not respect that Plaintiff was Buddhist, she continued to use other excuses at her disposal. Martin Dep. 162:14-162:21. In January 2013, Plaintiff showed a co-worker an X-ray of her daughter's healed leg that was broken. *Id.* at 162:22-163:25. Trauner overheard the conversation, called Plaintiff to her office, and asked Plaintiff to resume the Bible meetings. *Id.* at 163:3-8, 164:2-6. Plaintiff said no. *Id.* at 164:7-8. Trauner asked Plaintiff why she could not finish the Bible readings. *Id.* at 164:9.  Plaintiff told Trauner she had to pick up her daughter from daycare after work. *Id.* at 164:9-19. Trauner told Plaintiff to think about it and that maybe some day they would find a day to resume the Bible meetings. *Id.* at 164:21-24.

57.    Trauner's retrospective assessment of the Bible meetings is that they did not help Plaintiff understand Christianity because the readings did not continue long enough for her to understand the Bible's story about God and Jesus. Trauner Dep. 75:24-76:5. If Trauner and Plaintiff had read the Bible longer and in more depth, Plaintiff would have gotten "the whole picture" that she needed to submit to Christian baptism and confess that Jesus Christ is her savior and the son of God. *Id.* at 76:16-22; 58:24-59:7; 65:7-14; 66:10-12; 76:23-77:10; 131:10-20; 132:4-7.

58.    On January 25, 2013, Trauner offered Plaintiff the full-time payroll clerk position and asked Plaintiff to start immediately. Martin Dep. 165:13-165:6.  Trauner was aware that Plaintiff had returned to part-time employment with KinderCare. *Id.* at 166:7-8.  Plaintiff proposed asking her KinderCare director if she could resign immediately or if KinderCare

desired a two-week resignation notice. *Id.* at 166:7-14, 184:12-186:5. Trauner agreed and asked to be updated January 28, 2013. *Id.* at 166:15.

59.     On January 28, 2013, Plaintiff contacted her KinderCare director and her director requested that Plaintiff give a two-week notice. *Id.* at 166:17-24. Plaintiff sent KinderCare her two-week notice the same day. *See* Exhibit L, Martin Two-Week Notice of Resignation to KinderCare (Jan. 28, 2013).

60.     Plaintiff's last day at KinderCare was February 5, 2013. Martin Dep. 166:25-167:1.

61.     On February 6, 2013, Plaintiff reported to Stoops to start full-time. *Id.* at 167:2-5. Trauner told Plaintiff that her first full-time day would be February 11, 2013 because Plaintiff did not work on February 5 or 6 of that week. *Id.* at 167:6-8. Trauner told Plaintiff her hourly rate would change with the full-time position. *Id.* at 167:9-15.  Trauner told Plaintiff to wait until February 11, 2013 to complete payroll forms indicating her full-time status change and wage increase, and that Trauner would sign the forms on February 11, 2013. *Id.* at 167:16-168:5.

62.     On February 11, 2013, Plaintiff started full-time and asked Trauner about the change-of-status forms. *Id.* at 168:7-22.   Trauner told Plaintiff she was postponing their completion of the forms until March 28, 2013, the date for Plaintiff's annual performance review. *Id.*; *see* Ex. F at p. 5.

63.     On February 23, 2013, Plaintiff spent the morning in Trauner's office watching Trauner work on promissory notes. *Id.* at 168:23-169:5. That afternoon Trauner asked Plaintiff if she was sure she could not resume the Bible meetings with Trauner. *Id.* at 169:6-8. Plaintiff told Trauner that she could not read the Bible with her again. *Id.* at 169:9.

64.    On February 25, 2013, Trauner called Plaintiff to her office. *Id.* at 189:17-190:2 Only Trauner and Plaintiff were present for the meeting. *Id.* at 191:6-9. Trauner acted strangely and then told Plaintiff she was being fired. *Id.* at 191:20-192:20. Plaintiff asked Trauner if she had done something wrong. Trauner said no. Plaintiff asked Trauner why she was being fired. Trauner said it was because Plaintiff did not fit in with the company.  *Id.* at 193:11-15; *see* Ex. M, *infra*. Trauner's statement caused Plaintiff to tell Trauner that her reasons for asking Plaintiff to read the Bible with the previous Friday had just then become apparent. *Id.* at 193:16-18. Plaintiff then went to Myers and told him she had been fired.  *Id.* at 193:19-21. Myers said he already knew, and that Trauner told him Plaintiff did not finish the bank statement reconciliation. *Id.* at 193:22-194:2. Plaintiff said Trauner was lying and could prove it. *Id.* at 194:3-8. Myers did not care. *Id.* at 194:9-10. Then Plaintiff told Myers the real reason she was fired was her refusal to finish reading the Bible with Trauner. *Id.* at 194:11-14. After Myers could not find his tongue, Plaintiff told him she was going to file a discrimination lawsuit and left the premises. *Id.* at 194:15-20; 194:24-195:2.

65.    Myers knew Trauner planned to terminate Plaintiff because Trauner had already hired Plaintiff's replacement. Goodin Dep. 33:18-34:2.

66.    Lisa Goodin is a middle-aged Caucasian female who was born in the United States of America. Goodin Dep. 49:11-50:2. Goodin is also a devout Christian. *Id.* at 43:1-19.

67.    Two days after Trauner promoted Plaintiff as the full-time payroll clerk, Goodin emailed a resume to Trauner. *Id.* at 8:12-13. However, Goodin and Trauner spoke by telephone and exchanged emails prior to January 27, 2013. *Id.* at 8:20-21. Trauner deleted all her emails with Goodin. *Id.* at 10:19-11:4, 13:20-14:2. Goodin deleted all of her emails with Trauner except for the email dated January 27, 2013. *Id.*

68.     Goodin was the Assistant Office Manager in the payroll office for Andy Mohr Ford ("Andy Mohr"). *Id.* at 14:19-15:5. When she left Andy Mohr, Goodin was responsible for bi-weekly payroll for four stores; taxes; 401k; insurance; book out deals and rebates and warranty schedules; and helped out with other jobs "that needed to be done or needed help on." *Id.* at 15:7-16:11, 17:3-8. She made mistakes and errors in the payroll at Andy Mohr. *Id.* at 16:20-17:12.

69.     Goodin submitted a four-week notice of resignation to Andy Mohr on January 1, 2013. *Id.* at 18:18-25. Goodin left Andy Mohr because of "[t]ime and stress." *Id.* at 19:14-17. She was not worried about being unemployed and was looking forward to it. *Id.* at 20:25-21:9. However, just before she left Andy Mohr she told a co-worker that she needed to find a job but could not find one. *Id.* at 21:10-25, 23:7-13. That employee told Goodin to call Barb Winegar at Stoops to see if they had any job openings. *Id.* at 21:25-22:4. Goodin called Winegar, and Winegar gave Goodin Trauner's contact information. *Id.* at 22:13-23.

70.     Goodin called Trauner sometime between January 7, 2013 and January 11, 2013. *Id.* at 23:22-24:3; *contra* Trauner Dep. 118:3-9, 119:2-16 (Oct. 29, 2014). Trauner asked Goodin for her email address during the call and Goodin gave it to her. *See* Exhibit M, Goodin Letter to Trauner (Undated). Trauner then sent Goodin an email telling her that Stoops was growing its company, among other unknown things. *See Id.* at 8:20-21; *see* Ex. M; *contra* Trauner Dep. 118:3-9, 119:2-16 (Oct. 29, 2014) *and* Trauner Dep. 93:5-17 (Feb. 26, 2015). Goodin emailed Trauner her cover letter and resume sometime between January 7, 2013 and January 18, 2013. Goodin Dep. 24:4-9; *see* Trauner Dep. 138:14-139:4; *see* Exhibit N, Goodin Resume to Stoops (Undated).

71.     After that, Trauner had Goodin go to her Stoops office to pick up an employment application for Goodin to complete. *Id.* at 31:16-24.  This was the only time that Goodin was ever at Stoops prior to the start date of her employment. *Id.* at 31:16-24; *see e.g.,* Mazura Dep. 20:5-7; Rowland Dep. 29:20-30:5; Fredbloom Dep. 30:2-10.

72.     Goodin emailed Trauner an *additional resume* on <u>January 27, 2013</u>. *See* Trauner Dep. 138:14-139:4 (Oct. 29, 2014); *see* Goodin Dep. 8:12-21. This is the only non-extinct email between Goodin and Trauner, and Trauner expressly referred to the email attachment as an "**additional**" resume that Goodin sent Trauner.

73.     Trauner had Goodin meet her for lunch at The Coachman steak house in Plainfield, Indiana on February 6, 2013 for Goodin's first interview. *Id.* at 29:3-30:20, 31:24-32:11, 33:11-17. Goodin gave Trauner her completed employment application at this time. *Id.*; *see* Exhibit O, Stoops' Goodin Application for Employment (Feb. 6, 2013), Goodin Dep. Ex. 5.

74.     At their second lunch interview at The Coachman on February 25, 2013, Trauner told Goodin that Myers approved her $40,000 per year salary request and asked Goodin when she could start. *Id.* at 33:18-34:2; *see* Exhibit P, Trauner Email to Myers (Feb. 23, 2013 10:45 AM).  From January 7, 2013 to February 25, 2013, Goodin never asked Trauner if a position became available or even what employment position she had accepted! *Id.* at 34:20-35:17.

75.     The actual number and the content of emails that Goodin and Trauner exchanged is unknown because both subsequently deleted them. *See* Goodin Dep. at 10:19-11:4, 13:20-14:2; *see* Ex. M; *see* Exhibit Q, Stoops Buick, Inc. Resp. Pl. 1st Req. Prod. No. 16 (Aug. 17, 2014). Goodin's cover letter and resume are undated; Stoops redacted both documents; and Goodin did not keep electronic or hard copies of either document. *Id.* at 26:19-27:12.

76.     Since Goodin started on February 27, 2013, Trauner has *never* talked to Goodin about Christianity; has *never* brought Goodin religious materials or literature; *never* asked Goodin to attend church with her; and *never* asked Goodin to read the Bible with her. *Id.* at 40:16-41:2.

77.     Goodin has made numerous payroll errors at Stoops. *Id.* at 46:13-15, 53:14-16. Her second week at Stoops, Goodin forgot to pay the Finance Department. *Id.* at 46:16-47:1, 56:16-57:21. She has confused schedules and entered incorrect payroll information. *Id.* at 55:6-13, 57:18-21. She has failed to complete tasks Trauner has assigned her. *Id.* at 51:12-16. Department managers including Jarvis have given her incorrect timecards and commission sheets that she has entered into payroll. *Id.* at 47:12-49:4. Goodin disagrees with the characterization of the latter instances as "payroll errors" much less mistakes for which she is responsible. *Id.* at 47:18-48:4.

78.     It has taken Goodin "a while" to figure out the way and format that Trauner and Myers want payroll to be done. *Id.* at 51:20-52:13.

79.     Stoops' termination of Plaintiff's employment was *not* based on a business decision hire to hire Goodin. Trauner Dep. 94:22-95:2 (Feb. 26, 2015). Hiring and employing Goodin was not more cost-beneficial to Stoops. *Id.* at 94:22-95:2.

80.     Plaintiff submitted an online intake questionnaire ("questionnaire") via the Equal Employment Opportunity Commission's website ("EEOC") on March 1, 2013. Martin Dep. 214:25-215:2; *See* Exhibit R, Martin's EEOC Intake Questionnaire (March 1, 2013). She attached a computer file to the questionnaire containing her journal entries. *Id.* at 209:1-7. Plaintiff went to the EEOC and met in-person with an intake supervisor (EEOC "agent"). *Id.* at 214:15-215:7. She took her questionnaire and a copy of her journal. *Id.* at 209:1-7. The agent

told Plaintiff that the EEOC did "not need the journal." *Id.* at 209:4-7. Plaintiff checked the boxes next to race and religion on her questionnaire, and in response to the question "What happened to you that you believe was discriminatory?", Plaintiff wrote: "Discharged me at Stoops Buick, Inc. I am the only person of race, everyone else is Caucasian." Ex. R at p. 4 (Question 5).  Plaintiff checked "Box 2" on the last page of the questionnaire indicating she wanted the EEOC to investigate her race claim, and signed and dated the questionnaire. *See* Ex. R at 4. Plaintiff told the agent why she checked the box for race. *Id.* at 217:9-15.  However, the agent, who also prepared and filed Plaintiff's March 4, 2013 EEOC Charge, did not check the box for race on the charging form, telling Plaintiff "that's not as strong" as retaliation and national origin claims. *Id.* at 217:6-8; *see* Exhibit S, Martin Charge of Discrimination (Mar. 4, 2013), Martin Dep. Ex. 13; *see* Ex. R at 1. The agent did not inform Plaintiff of the consequences for failing to include the race claim in her charge; Plaintiff was not represented by an attorney and no attorney was present when she filed the questionnaire online, met with the agent and the agent prepared and filed her charge, or, at any other time during the EEOC's investigation of her charging allegations. *See* Martin Dep. 322:14-324:14; *see* Ex W at 4, ¶ 16; *see* Ex. S.

81.     Trauner prepared a payroll change notice regarding Plaintiff's termination on February 25, 2013. *See* Exhibit T, Stoops' Martin Payroll Change Notice (Feb. 25, 2013), Trauner Dep. Ex. 13. The notice says Plaintiff was terminated because: (a) her accounting degree was not as beneficial as Trauner expected; (b) Trauner and Plaintiff had "communication issues" that complicated and slowed Plaintiff's training, *see* Trauner Dep. 114:21-115:19; and, because (c) she is "not a good fit for this position." *See* Ex. T.

82.     Myers, convinced that he and Trauner's ducks weren't in a row, conveyed to Trauner that she led him to understand that Plaintiff was terminated because of "incompetence"

not some other reason. Myers Dep. 33:22-34:2; *See* Exhibit U, Myers Email to Trauner (Mar. 1, 2013). He told Trauner that if he was "wrong about that" to contest Plaintiff's unemployment benefits. Ex. U.

83.     Trauner wrote a response to Plaintiff's EEOC charge for Stoops' lead counsel in this case, Jeffrey B. Halbert ("Halbert").  The only reason Trauner gave for firing Plaintiff in the response was that Plaintiff was "unable to complete her assignments satisfactorily." *See* Exhibit V, Trauner's Response to Plaintiff's EEOC Charge (Undated).

84.     Stoops' document retention policy requires its personnel to retain payroll documents for a minimum of ten years. Trauner Dep. 29:3-8. Stoops did not institute a litigation hold with respect to documents relevant to this case, and never instructed anyone, verbally or in writing, *not* to delete emails or other information relevant to this case. Stoops Dep. 100:12-101:16 (July 17, 2015). Stoops did not produce any of Plaintiff's payroll work-product documents, or Plaintiff's internal payroll-related email communications because Stoops wiped Plaintiff's work computer clean and deleted her email account. Stoops Dep. 23:2-25:12, 34:1-11 (Aug. 20, 2015).

85.     Halbert, Defendants' lead counsel, represented all seven current Stoops office employees at their non-party depositions, asserting that the representation was a benefit of each office employee's employment with Stoops. Stocking Dep. 4:9-22; Robinson Dep. 5:13-7-8; Roush Dep. 4:14-6:17; Fredbloom Dep. 4:19-5:16; Schrage Dep. 4:18-24; Mazura Dep. 4:14-5:10; Jarvis Dep. 4:19-5:13. No such benefit is mentioned in the Stoops Employee Handbook. *See* Ex. E.  Halbert represented all seven current Stoops office department employees so that he could coach each employee how to protect Stoops and Trauner at their depositions; to keep facts about the case from being revealed under a claim of privilege; all while protecting facts

42

potentially favorable to Plaintiff by virtue of his "attorney-client" communications with the office employees. *See e.g.,* Robinson Dep. 5:21-6:1.

## IV.   APPLICATION

### A.   Plaintiff Can Bring Her Claim For Racial Discrimination.

This Court has previously narrowed the *Novitsky* holding to its facts and looked beyond the four corners of a plaintiff's EEOC charge. *See Cain,* No. 1:13-cv-01127-SEB-MJD, ECF No. 76 at 9-13; *see* 196 F.3d at 701-703. The Court should look beyond the four corners of Plaintiff's EEOC charge here, and allow her to bring her claims for racial discrimination.

Plaintiff satisfies all of the relevant legal standards on this issue, even under *Novitsky* because she: communicated her race claim to the EEOC in writing, *see Vela,* 218 F.3d at 665 n. 2; *Cain,* No. 1:13-cv-01127-SEB-MJD, ECF No. 76 at 9-13; brought the claim to the EEOC's attention while filing her charge, *Jordan,* 30 F.Supp.3d at 751; did not include the claim because the EEOC agent misinformed her about including it in the charge or left her uninformed regarding the consequences of failing to include it in the charge, *see Novitsky.* 196 F.3d at 701-703; did not "frustrate the conciliation process" since Plaintiff's race claims for retaliation, harassment, and wrongful discharge would not have been easier to conciliate than her charges for the same based on religion and national origin, which Stoops did not wish to conciliate, *see Novitsky,* 196 F.3d at 701-703; *see* Dkt. 1 at 6-7, ¶¶ 33-39; and, was not accompanied by a lawyer when her EEOC charge was prepared and she signed the charge, *Novitsky,* 196 F.3d at 703.  Under these facts, Plaintiff "intended the agency to investigate the allegations" and did all that she could to present her racial discrimination claims to the EEOC. *Jordan,* 30 F.Supp.3d at 751; *see Cain,* ECF No. 76 at 9-13; *Jackson,* 2002 WL 460841, at *3.

Plaintiff's complaint of racial discrimination also passes the two-pronged *Jenkins* test. *See* 538 F.2d at 167; *see Cheek,* 31 F.3d at 500; *see Murray,* 23 F.Supp.3d 938. Plaintiff's racial discrimination claim properly encompasses and is like or reasonably related to the allegation of national origin discrimination included in her charge: her Asian race and Chinese national origin did not "fit in" with the exclusively white and American-born workforce at Stoops. *See Jenkins,* 538 F.3d at 167; *see* Dkt. 1 at 6-7, ¶¶ 33-39; *see* Ex. S. Plaintiff's race claim can reasonably be expected to grow out of an EEOC investigation of the allegations in Plaintiff's charge that she was "discriminated against because of [her] national origin, Chinese, in violation of Title VII", *see* Ex. S, because the factual basis of the national origin and race discrimination allegations were the same. Plaintiff was the only non-white, non-American born Stoops employee from March 28, 2012 to February 25, 2013, and Stoops terminated Plaintiff because she "did not fit in the company." *See Id.* at ¶ 45; *see* Martin Dep. 217:9-15; *see* Ex. S.  Plaintiff's complaint of racial discrimination is, therefore, factually and legally intertwined with her national origin charge such that it satisfies the *Jenkins* test and merits further analysis. *See* Dkt. 1 at 6-7, ¶¶ 33-39; Ex. R; Ex. S.

### B. Plaintiff Presents Direct Evidence That Stoops Harassed, Retaliated, And Discharged Her On The Basis Of Her Race, Religion, and National Origin.

A rational jury could infer that Trauner was motivated by discriminatory intent to fire Plaintiff. *See Burnell,* 647 F.3d at 704; *Oest,* 240 F.3d at 611. Plaintiff survives summary judgment because Trauner's admissions that she wanted Plaintiff to find salvation through Jesus Christ; Trauner's ambiguous statements about why the limited duration of the Bible meetings did not help Plaintiff understand Christianity; the suspicious timing of Plaintiff's promotion to the full-time payroll clerk position and her subsequent termination less than a month later; the

suspicious nature and timing of Trauner's pre-employment communications and interviews with

Goodin; and, Trauner's systematically better treatment of white, American-born, Christian

employees are *enough circumstantial evidence to create a triable issue* as to whether Plaintiff's

termination was motivated by Trauner's discriminatory intent. *See Wallace,* 103 F.3d at 1397;

*Burnell*, 647 F.3d at 708; *Darchak,* 580 F.3d at 631.

### 1. Goodin I Have Loved, But Martin I Have Hated: Trauner's Discriminatory Election.

Trauner admitted that she wanted Plaintiff to understand Christianity and to find salvation

through Jesus Christ. She admitted that *finishing* reading the Bible with Plaintiff was the only

way to accomplish her goal because it would have given Plaintiff a complete understanding of

God (Old Testament) and Jesus (New Testament). In order to be saved, Plaintiff had to

understand man's sinful condition beginning with Adam (Genesis) and man's redemption from

sin through the Christ, the begotten man-god (John 3:16).[4] Trauner Dep. 64:20-21 (where

Trauner stated that she started the Bible readings with Plaintiff "at…Genesis 1"); Trauner Dep.

62:11-21 (where Trauner admitted she made and gave Plaintiff a bookmark with a bible verse on

it) and Martin Dep. 117:21-118:6 (where Plaintiff stated the bookmark had the name "John" on

it). By January 2013, Trauner had definitively perceived that Plaintiff's nine-month refusal to

hear or receive Trauner's sermons meant that Plaintiff was not predestined for salvation as one of

God's elect, and she handed Plaintiff "over to Satan to be confirmed in the obstinacy of [her]

breast."[5] *See* Calvin, John, *Institutes of the Christian Religion*, *cited supra* at 8. Trauner then

---

[4] Although Plaintiff has various images of the Buddha, she does not believe the Buddha was god and does not worship or pray to images of the Buddha. Plaintiff is not an idolater; she is an iconodule. Nevertheless, she does not believe nor worships the god who commanded the Israelites to have no other gods before him. Exodus 20:1-5 (KJV), available at https://www.kingjamesbibleonline.org/Exodus-20-3/.

[5] For, Christ commanded Trauner: "Give not that which is holy unto the dogs, neither cast ye your pearls before swine, lest they trample them under their feet, and turn again and rend you. Matthew 7:6 (KJV), available at https://www.kingjamesbibleonline.org/Matthew-7-6/. "And whosoever shall not receive you, nor hear you, when ye

sought and replaced Plaintiff with Goodin, who is "absolutely" a Christian. Goodin Dep. 43:1-19.  Goodin has Trauner loved, but Plaintiff Trauner has hated.  What reasonable juror "would not be able to see here that it is election alone that discriminates among" Goodin and Plaintiff?

*See* Calvin, *Commentary on Romans*, 11:7, *cited supra* at 8.

### 2. Trauner's Ambiguous Statements About Her Reasons For Firing Plaintiff Directly Point To The Discriminatory Intent Of Stoops' Decision To Fire Plaintiff.

Trauner gave the same reason for her decision to fire Plaintiff numerous times. She stated that Plaintiff did not "fit in with the company" and never explained how or why Plaintiff did not "fit in." Trauner's statement is, therefore, ambiguous.  In *Burnell*, 647 F.3d at 708, and *Darchak*, 580 F.3d at 631, the Seventh Circuit held that ambiguous statements are circumstantial evidence that can establish direct evidence of discriminatory intent.

First, Trauner admitted that Stoops did terminate Plaintiff based on a business decision in the interest of the company's future or because Plaintiff made payroll mistakes. Stoops Dep. 104:16-19 (Aug. 20, 2015); Trauner Dep. 94:22-95:2. Trauner's admissions immediately eliminate these reasons as possible explanations resolving the ambiguity.

If Plaintiff did was "not a good fit for [the payroll clerk] position[,]" evidence about who Trauner perceived as a good fit for the position will resolve the ambiguity of Trauner's stated reason. Goodin qualifies because Trauner sought her to replace Plaintiff, hired her, and because she is still employed by Stoops. Goodin is a white, American-born, Christian individual. Goodin's race, religion, and national origin made her a "good fit for the payroll clerk position" because the entire office department was composed of white, American-born, Christian employees. Goodin was a "good fit for the company" because the entire dealership was

---

depart thence, shake off the dust under your feet for a testimony against them." Mark 6:11 (KJV), available at https://www.kingjamesbibleonline.org/Mark-6-11/.

composed of employees who were white and born in the United States, and almost entirely of Christian employees. Goodin was a "good fit for the company" because she would not view the Stoops congregation's morning prayer and bible meetings with a suspicious eye. Goodin was a "good fit for the company" because she would not wear a necklace with images of the Buddha to the same place where the Stoops congregation joined hands and asked Jesus to bring wealth and financial success to the dealership. Martin Dep. 176:13-177:7; Myers Dep. 38:3-9.

Through the process of elimination and viewed circumstantially, Trauner's ambiguous statements that Plaintiff did not fit in with the company point directly to Trauner's discriminatory reasons for firing Plaintiff: because she was Asian, Chinese, and Buddhist. *See Adams,* 324 F.3d at 939; *See Oest,* 240 F.3d at 611.

### 3. Evidence of Suspicious Timing Points Directly To Trauner's Discriminatory Animus.

Trauner gave Plaintiff the full-time payroll clerk position on January 25, 2013. Trauner confirmed that Plaintiff resigned from KinderCare on January 28, 2013. When Plaintiff reported to work for her first day of full-time employment on February 6, 2013, Trauner delayed completion and processing of Plaintiff's employment and wage status change paperwork until February 11, 2013.  On February 11, 2013, Trauner delayed completion of Plaintiff's paperwork again until March 28, 2013. One month after she gave Plaintiff the position, and 14 days after Plaintiff started the position, Trauner fired Plaintiff. Why make certain that Plaintiff resigned from KinderCare unless Trauner wanted to leave Plaintiff jobless? Why delay processing Plaintiff's status change paperwork until March 28, 2013 unless Trauner knew Plaintiff would be gone by then? Why give Plaintiff the position and fire her 30 days later? The latter question is critical. Stoops claims it was because Trauner received an unsolicited inquiry from Goodin *after* she gave Plaintiff the position. [Dkt. 43 at 1.] However, Trauner had, in fact, already exchanged

emails and telephone calls with Goodin, and had Goodin's resume prior to January 25, 2013 and as early as January 7, 2013. Goodin Dep. 23:22-24:3; 8:20-21. With no answers forthcoming from Stoops, the critical question of why Trauner gave Plaintiff the position and terminated her 30 days later points directly to Plaintiff's refusals to finish the Bible readings with Trauner. Martin Dep. 162:14-164:24. Trauner lied when she said that she stopped asking Plaintiff to read the Bible with her in September 2012. Trauner Dep. 111:24-112:17. Rowland personally observed the event that proves Trauner lied. Rowland Dep. 35:18-37-6. The suspicious timing of Trauner's promotion and termination of Plaintiff proves that Trauner fired Plaintiff because of her refusal to finish the Bible readings with Trauner.[6]

### 4. Evidence That Office Employees Outside Of Plaintiff's Protected Classes Systematically Received Better Treatment Than Plaintiff Points Directly To Trauner's Discriminatory Intent.

Because Stoops argues that Plaintiff and other office employees were not similarly situated, Plaintiff will dispose of Stoops' argument in her favor. Plaintiff and all seven other office employees were hired by and dealt with Trauner. Robinson supervised the six employees as the Assistant Manager. Trauner gave all of them job assignments and reviewed their job performances. *See* Ex. I; *e.g.* Robinson Dep. 19:23-20:15. Trauner required them to help out with other projects during any "down time." *See* Robinson Dep. 19:23-20:15; Rowland Dep. 17:18-18:18. Some of their job duties overlapped or required them to work with one another on projects. *Compare* Martin Dep. 221:20-222:4 *with* Schrage Dep. 10:4-14:4 *and* Rowland Dep. 26:9-16 *and* Mazura Dep. 12:3-4; *see* Ex. P.  They thought of themselves and referred to one another as members of the same department. *See e.g.,* Robinson Dep. 16:9-15. Thus, Plaintiff's

---

[6]  Trauner's reasons for having the Bible meetings and for wanting the meetings to continue were not limited to the single purpose of converting Plaintiff to Christianity. Trauner's purposes including helping Plaintiff better understand American culture and better fit into American society. Trauner's Christian beliefs are, therefore, "colonial," racist, and inherently antagonistic to other cultures.

comparators dealt with the same supervisor, Trauner; were subject to the same standards, Trauner's standards; engaged in similar office administration tasks; and, because Plaintiff was solely responsible for payroll and each had their own responsibilities within the office department, there are no differentiating or mitigating circumstances that would distinguish their conduct or Trauner's treatment of them." *See Gates,* 513 F.3d at 690. Stoops' analysis of Plaintiff's comparators is too rigid, looks for "clones," ignores that Plaintiff's burden to satisfy this *prima facie* element is "not onerous[,]" and "devolves into a one-to-one mapping between employees." *Coleman,* 667 F.3d at 841, 846-47.

The evidence shows that Trauner did not harass other office employees with weekly invitations to read the Bible with her, to go to church with her, or to discuss Christianity with her.  Trauner never caused any other employee to stay after work without pay for two hours to read the Bible and sing Christian songs with Trauner.  Trauner offered Plaintiff additional part-time hours, knew Plaintiff resigned from other part-time employment in accepting Trauner's offer, and then did not give Plaintiff the hours Trauner promised.  Trauner did not do this to any other part-time or full-time office employee.  Other employees made errors in the performance of their job duties while Plaintiff was employed there.  No office employee was terminated for making errors.  Trauner treated Rowland and Nance more favorably than Plaintiff because rather than firing them for their performance issues, she kept Rowland in her HR position and tried to "re-inspire" Nance. These facts establish that other office employees outside of Plaintiff's protected classes received systematically better treatment than Plaintiff.

**C.**     **"This Case Is About A Legitimate, Nondiscriminatory, Business Decision."**

Stoops argued in its Brief in Support of Defendants' Motion for Summary Judgment, *see* Dkt. 43, that Plaintiff "cannot satisfy her burden with regard to the second and fourth factors of

49

her prima facie case. *Id.* at 20. However, Stoops asserted at the outset that "[t]his case is about a legitimate, nondiscriminatory, business decision." *Id.* at 43.  Stoops came forward with evidence purporting to show that Stoops terminated Plaintiff's employment because Stoops, by Trauner, "made a business decision in the interest of the future of the Company as well as the level of oversight required by Trauner relating to Martin." *Id.* at 1-2. Stoops then cited to evidence purporting to establish "legitimate reasons for its actions that would rebut a prima facie showing of discrimination." *See Jayasinghe,* 760 F.2d at 135.  Thus, "the prima facie threshold is no longer a relevant issue" and the Court's analysis proceeds "directly to pretext." *See Id.*; *see Peals,* 5 F.Supp.3d at 1003.

### 1. Stoops Failed To Articulate A Nondiscriminatory Reason For Trauner's Religious Harassment Of Plaintiff.

Stoops failed to offer a legitimate, nondiscriminatory reason for Trauner's ten-month harassment of Plaintiff to read the Bible with her. Stoops merely argued that Plaintiff did not present evidence of Stoops' religious harassment of Plaintiff using the direct method of proof, and then argued that its termination of Plaintiff was based on a legitimate business decision. *See* Dkt. 43 at 14-17. Plaintiff was "shocked" that Trauner's first invitation to read the Bible with her progressed to the point where Trauner was researching personal details about her minor child's church.  Plaintiff's co-workers thought that Trauner telling Plaintiff about her Christian religion and beliefs was uncomfortable and unfriendly. This establishes that Plaintiff's work environment was "both objectively and subjectively offensive." *Porter v. City of Chicago,* 700 F.3d 944, 955 (7th Cir. 2012). It is necessary to point out that when Plaintiff said she thought that Myers and Trauner were nice people, she was strictly referring to her first meetings with Myers and Trauner and the early period of her employment at Stoops. Martin Dep. 341:21-343:22.

Trauner's continued pressuring of Plaintiff to read the Bible with her was based Plaintiff's race, religion, and national origin. *See Porter,* 700 F.3d at 955. Trauner knew Plaintiff was Buddhist and wanted to help her find salvation through Jesus. Trauner wanted to "Americanize" Plaintiff and conform her to Stoops' white work force. The pressure resulted in Plaintiff having to stay after work for two hours every week without pay, and she missed spending time with her daughters and husband. Plaintiff relented after Trauner abused her position of authority and implied that if Plaintiff read the Bible with her she would receive a full-time job. Trauner ignored Plaintiff's statements that she was Buddhist and not interested in reading the Bible and had to resort to other excuses out of fear of losing her job or not receiving a promotion.  After the Bible meetings ended in September 2012, Trauner continued to ask Plaintiff to read the Bible with her through February 2013. The foregoing facts establish that Trauner's conduct was frequent and pervasive. *See Porter,* 700 F.3d at 955. Trauner's conduct interfered with Plaintiff's ability to receive the sound and productive training she should have received instead of being summoned to Trauner's office to hear Trauner sermonize about Christianity and ask Plaintiff about church and to read the Bible with her. Just because Trauner did not expressly threaten or make derogatory comments to or about Plaintiff, does not mean that there is no basis for employer liability. *See Porter,* 700 F.3d at 955.

Reasonable jurors could find that Trauner harassed Plaintiff on the basis of her race, religion and national origin. *Id.*; *see* n. 7, *supra*.

### 2.    Goodin's Experience In The Car Dealership Industry Is Irrelevant.

Plaintiff possessed over eight years of employment experience in the field of accounting and six years of college-level education with a near perfect GPA specific to accounting. Plaintiff knew how to do accounting. Knowing how to do accounting qualifies an individual for a job in

the accounting profession, and makes the level or number of years of experience in the accounting profession irrelevant in the automotive dealership industry. Goodin said so herself. Goodin Dep. 51:24-52:13. What matters is how quickly the new accounting employee can learn her new employer's specific accounting preferences. *Id.* This takes a while and years of experience can prove inapplicable to a new employment situation. *Id.* Because Goodin's testimony shows that the number of years she has been employed in the automotive dealership is irrelevant, it undercuts Stoops' stated reason for terminating Plaintiff and presents a jury question as to pretext. *See Coleman,* 667 F.3d at 841-842.

Evidence that Plaintiff only made two payroll errors at a maximum also undercuts Stoops' reason that Goodin was more qualified and experienced for the job. Since Plaintiff only made two payroll errors and was completing her job assignments and taking on additional non-payroll tasks, there was no need to hire *anyone* else for the position.

Stoops argues that Goodin was hired to come in and take over the payroll and HR responsibilities that Plaintiff was originally hired to perform.  *See* Dkt. 43 at 27. The evidence shows that Plaintiff was never hired for HR or expected to perform HR duties. Moreover, when Trauner hired Goodin, Rowland *was still employed in Stoops' HR position*, and did not *voluntarily* leave the position until seven months after Goodin's start date. Rowland Dep. 14:4-6.

Finally, in Trauner's Payroll Change Notice dated the same day as Plaintiff's termination, she makes no mention of her perception that Goodin was more experienced, qualified, or better prepared to handle the position. *See* Ex. T.  Trauner states no such reason in her written response to Plaintiff's EEOC charge. *See* Ex. V.  If Trauner honestly held or perceived this belief, there is no rational justification for Trauner's failure to express that perception *if* it was indeed timely held by Trauner and not invented by her attorney.

### 3.   "There Was Not A Time That Plaintiff's Accounting Degree Wasn't Beneficial."

Trauner admitted that there was not a time that Plaintiff's accounting degree was not beneficial. Trauner Dep. (Oct. 29, 2014). Trauner could not have honestly held the belief that Plaintiff's accounting degree was not as beneficial as she expected it would be since she admitted it was beneficial the entire length of Plaintiff's employment.

To have that honestly held belief, Trauner would also have to have the honest believe that she terminated Plaintiff because she failed to perform according to Trauner's reasonable expectations.  But that it is not the case: "Ella Martin was not fired because she made mistakes." Stoops Dep. 104:16-19 (Aug. 20, 2015). Trauner would have to have a further belief that she terminated Plaintiff because it would be cost-beneficial to Stoops. But that is not that case. Stoops' termination of Plaintiff's employment was *not* based on a business decision hire to hire Goodin. Trauner Dep. 94:22-95:2 (Feb. 26, 2015). Hiring and employing Goodin was not more cost-beneficial to Stoops. *Id.* at 94:22-95:2.

### 4.   Stoops' Claim That Goodin Was Immediately "Work-Ready" Is Contradicted by the Evidence.

Stoops' claim that Trauner honestly perceived Goodin as immediately work-ready is contradicted by the evidence. Goodin testified that it has taken her "a while to figure out the way" Trauner wanted the payroll clerk job done. Goodin Dep. 51:24-52:13. *cf.* Trauner Dep. 147:22-148:4. Goodin immediately made mistakes upon starting the job, including failing to pay Stoops' finance department her second week. Also, the "Qualifications" section of Goodin's resume shows that Goodin was not immediately prepared to take the position without any training or assistance from Trauner. *See* Ex. N. In that section, Goodin stated that she was "currently working on Reynolds and Reynolds software[.]" *See* Ex. N. This would actually make

Goodin *less* qualified than Plaintiff, and require that she receive training on ADP. To explain, Stoops did not use a Reynolds system; it used the ADP system and ADP and Reynolds are competing DMS systems. *See* Ex. N; *See* http://www.autonews.com/article/20140113/RETAIL/301139967/inside-mission-impossible:-a-dms-changesoftware.

### 5.   Stoops' Reason That It Terminated Plaintiff Because She Required Weekly Training Sessions Is Factually Baseless.

"You could call that training, but I would not say that was called training." That's how Plaintiff describes her time spent in Trauner's office every Thursday and Friday after being beckoned there by Trauner. Martin Dep. 183:16-19, 121:15-23; *see* Robinson Dep. 22:3-12. Plaintiff spent most of the time in Trauner's office sitting and watching Trauner write emails and take phone calls. *Id.* The rest of the time, Trauner asked Plaintiff to read the Bible with her, discussed Christianity, and tried to get Plaintiff to convert to Christianity. *Id.* at 108:6-109:16, 120:8-119. Plaintiff was in Trauner's office for training, if you could call that training, so often that other department employees called Plaintiff Trauner's "golden child." *See* Dkt. 43 at 18 (citing Martin Dep. 109:12-16). A reasonable juror would agree with Plaintiff and not characterize Trauner's time with Plaintiff as "training." *See* Martin Dep. 278:11-279:25. Further, because Trauner spent all of this time with Plaintiff in her office behind closed doors, other office employees only have personal knowledge that Plaintiff was in Trauner's office with the door closed. Only Trauner and Plaintiff know what happened in Trauner's office, and their versions of what happen are conflicting. Plaintiff creates a triable issue as to this factor and jurors should be able to evaluate Trauner's (lack of) credibility for themselves.

### 6.   Plaintiff Made At Most Two Payroll Errors During Her Eleven Months Of Employment.

Aside from the Jarvis duplicate payroll error and the Trauner triple payment payroll error, Plaintiff did not make or contribute to any other errors or mistakes during her employment. Goodin would not attribute fault to Plaintiff for the Jarvis error because Plaintiff was responsible for entering the data Jarvis gave her into payroll. Jarvis was responsible for giving Plaintiff correct payroll data including the correct computer file names and dates for each week.  Goodin and Robinson would not blame Plaintiff for the Trauner payroll error, either.  Part of the payroll clerk's job is catch any errors made during payroll entry in time for employee checks and direct deposits to process and issue through Paylocity. Because Plaintiff caught the mistake and told Trauner in time for her to correct it and receive her paycheck, blame rests with Trauner for the resulting triple payment.  A reasonable juror could find that Plaintiff did not make any mistakes and that this factor is a factually baseless reason for terminating Plaintiff.

### 7.    Stoops Has Failed To Give An Honest Explanation For Its Behavior.

Plaintiff offers the following evidence to further prove that Stoops' asserted reasons for terminating Plaintiff are not honest explanations.

Trauner, Goodin, and Stoops all deleted evidence relevant to this case. Goodin's explanation for deleting her email correspondence with Trauner is especially suspicious and suggests that Trauner and Goodin conspired to delete favorable evidence to Plaintiff. Goodin Dep. 10:19-11:7. Emails do not take up space on a computer because they are stored on a server. But, Goodin explained that emails took up space on her computer hard drive so she deleted them. *See Id.* This defies explanation and is not believable. Trauner's explanation as to why Stoops deleted the contents of Plaintiff's work computer hard drive, emails, and email account is equally suspicious. Despite the fact that Stoops had a policy of retaining all payroll documents for 10 years and Stoops' internal email communication system was used to prepare payroll documents,

Stoops Freightliner's IT Department "updated" Plaintiff's computer immediately after Plaintiff told Myers she was going to file a discrimination charge, and the update resulted in a total deletion.

It is also suspicious that after Plaintiff told Myers she would be filing a discrimination lawsuit on the day of her termination, Stoops, in violation of its own rules and policies, subsequently offered to release Plaintiff on a $1,350.00 balance from a $2,500.00 loan that Stoops extended to Plaintiff. Martin Dep. 199:23-206:12; *see* Ex. E at 41; *see* Dkt. 43 at 11 n. 3.

Stoops also declined to protest Plaintiff's unemployment benefits, which makes little sense if Trauner believed she had terminated Plaintiff for just cause.

Stoops directed its counsel, or its counsel instructed Stoops to allow him, to represent all of its current office employees at their non-party depositions in this action in order to provide legal advice to non-management employees and protected Plaintiff's ability to gather information under a claim of privilege.

Knowing that Plaintiff was a member of protected classes as of her hire date, Stoops did not provide Plaintiff with a copy of the Stoops Employee Handbook, and did not complete an "Employee Orientation Report" for Plaintiff. Stoops never informed Plaintiff about or explained the grievance procedures for harassment and discrimination based on race, religion, or national origin, but accused Plaintiff of failing to follow those procedures and failing to complain to Myers, the only manager above Trauner, and the same manager who led daily prayer and Bible meetings at the dealership. *See e.g.,* Dkt. 43 at 16.

### D.   Plaintiff Survives Summary Judgment On Her Claim Of Intentional Infliction of Emotional Distress Against Trauner Under Indiana State Law.

Reasonable jurors could find that Trauner "engaged in extreme and outrageous conduct." *See Shifrin,* 991 F.Supp.2d at 1047. It was extreme and outrageous for Trauner to lead Plaintiff to

believe she finally had the career she had wanted; to insure Plaintiff quit her position at KinderCare that she already previously resigned from once making a third employment try with KinderCare extremely unlikely; and then to fire Plaintiff one month later—all just because Plaintiff was Buddhist and refused to keep reading the Bible with Trauner. Indeed, a reasonable juror could say, "That's outrageous!" Likewise, jurors could find that Trauner did this intentionally or recklessly by leading Plaintiff to believe she would have a long term, full-time position with Stoops as the payroll clerk, when, in fact, Trauner already made plans to hire Goodin. It was or should have been readily apparent to Trauner that Plaintiff would suffer financial, social and emotional difficulties as a result. Plaintiff has suffered severe emotional distress directly and proximately caused by Trauner's outrageous and intentional acts.

## V.    CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that this Court enter an order denying Defendants' Motion for Summary Judgment; and for all other relief this Court deems just and proper.

Respectfully Submitted,

*/s/ Gabriel J. Quearry*
Gabriel J. Quearry, #30412-32
gq@quearrylaw.com
QUEARRY LAW, LLC
386 Meridian Parke Lane, Suite A
Greenwood, Indiana 46142
(317) 285-9896 (telephone)
(317) 882-5602 (facsimile)
*Attorney for Plaintiff*
*Ella Sun Martin*

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2015 a copy of the foregoing document was submitted electronically to the individual(s) at the address(es) listed below.

Jeffrey B. Halbert
BOSE MCKINNEY & EVANS, LLP
JHalbert@boselaw.com

Philip Zimmerly
BOSE MCKINNEY & EVANS, LLP
PZimmerly@boselaw.com

*/s/ Gabriel J. Quearry*
Gabriel J. Quearry