UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ELLA SUN MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:14-cv-00298-RLY-DKL |
| | ) | |
| STOOPS BUICK, INC., and | ) | |
| DEBRA  TRAUNER, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Ella Sun Martin, is a former employee of Stoops Buick, Inc.  After she was terminated by her supervisor, Debra Trauner, Plaintiff brought the present employment discrimination lawsuit against the Defendants, alleging she was terminated on the basis of her race (Asian), national origin (Chinese), and religion (Buddhism), in violation of Title VII of the Civil Rights Act of 1964.  Plaintiff also alleges Trauner intentionally caused Plaintiff to suffer emotional distress under Indiana state law. Defendants now move for summary judgment.  For the reasons set forth below, Defendants' motion is **GRANTED in part** and **DENIED in part**.

## I.      Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant

bears the initial responsibility of informing the district court of the basis of its motion,

and identifying those portions of designated evidence which demonstrate the absence of a

genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  After

"a properly supported motion for summary judgment is made, the adverse party 'must set

forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty

Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the

outcome of the case under the governing law.  *Clifton v. Schafer,* 969 F.2d 278, 281 (7th

Cir. 1992).  A factual issue is genuine only if there is sufficient evidence for a reasonable

jury to return a verdict in favor of the non-moving party on the evidence presented.

*Anderson,* 477 U.S. at 248.  In deciding a motion for summary judgment, the court "may

not 'assess the credibility of witnesses, choose between competing reasonable inferences,

or balance the relative weight of conflicting evidence.'"  *Bassett v. I.C. Sys., Inc.*, 715 F.

Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chicago*,

599 F.3d 617, 619 (7th Cir. 2010)).  Instead, it must view all the evidence in the record in

the light most favorable to the non-moving party and resolve all factual disputes in favor

of the non-moving party.  *Anderson,* 477 U.S. at 255.

## II.   Factual Background

The  court takes the facts and all reasonable inferences that arise therefrom in the

light most favorable to the non-moving party, the Plaintiff herein.

Stoops is a car dealership located in Plainfield, Indiana.  Stoops has approximately 80 employees engaged in various positions relative to sales, service, finance, and accounting.  (Filing No. 44-2, Deposition of Lisa Goodin ("Goodin Dep.") at 42).  Jim Meyers serves as vice president and general manager of Stoops and is a partial owner of the business.  (Filing No. 44-6, Deposition of James Meyers ("Meyers Dep.") at 9).  Trauner has been the office manager since 1993.  (Filing No. 44-12, Deposition of Debra Trauner ("Trauner Dep.")[1] at 10).

### A.    Plaintiff's background and employment with Stoops

Plaintiff moved to the United States from China on March 12, 2003, and she became a United States citizen in 2011.  (Filing No. 44-4, Deposition of Ella Sun Martin ("Plaintiff Dep.") at 20).  In September 2011, Plaintiff received a B.S. in accounting from Harrison College.  (*Id.* at 19).  Two months after graduating, Plaintiff responded to a newspaper ad for a payroll clerk/human resources position in Stoops' Administration Office.  (*Id.* at 35-36).

On March 23, 2012, Trauner hired Plaintiff for the payroll position on a part-time basis.  (*Id.* at 87, 94).  Trauner discussed the possibility of the position becoming full-time.  (Trauner Dep. at 71-72; Plaintiff Dep. at 260).  Although Plaintiff did not have any

---

[1] In addition to her individual deposition, Trauner was the Rule 30(b)(6) corporate designee of Stoops.  Her depositions are attached in three parts, the first two of which are her individual depositions (Filing Nos. 44-12 & -13) and the third of which is her Rule 30(b)(6) deposition (Filing No. 44-14).  For simplicity's sake, the court will identify her deposition testimony as "Trauner Dep." at [page number]".  The court will do the same with Plaintiff's deposition, which can be found at Filing Nos. 44-4, 55-23, and 55-24, and Lisa Goodin's deposition, which is found at Filing No. 44-2 and 55-31.

previous experience in auto dealership accounting, (Plaintiff Dep. at 24), Trauner hired

Plaintiff based on her accounting degree, which no one else in the department possessed,

including Trauner.  (Trauner Dep. at 31-32).

After being hired, Plaintiff worked on Wednesdays, Thursdays, and Fridays,

earning $15.00 an hour.  (Plaintiff Dep. at 87-89).  Trauner provided weekly training to

Plaintiff in Trauner's office on Thursdays and Fridays, spending approximately five

hours a week or more on such training.  (*Id.* at 52, 96, 108; Trauner Dep. at 111).

Plaintiff was supervised by Trauner, and she was primarily responsible for payroll and

other accounting functions.  (Plaintiff Dep. at 94, 97-98, 131).

### B.      Trauner offers to read the Bible with Plaintiff

Two months after starting work, in May 2012, Plaintiff indicated to others in the

Administration Office that her daughter wanted to be baptized and that she did not

understand what baptism meant.  (*Id*. at 102, 104-05).  Trauner overheard the

conversation, and she approached Plaintiff the following week to volunteer to help

Plaintiff understand her daughter's request by reading the Bible with Plaintiff.  (*Id.* at

103-04, 107, 112-13; Trauner Dep. at 58-59).  Plaintiff turned down Trauner's offer

because she was not interested in the Bible and she was a Buddhist.  (Plaintiff Dep. at

113-14).

In June 2012, Trauner spoke with Plaintiff on five more occasions regarding

Plaintiff's interest in attending church or reading the Bible, and Plaintiff later recorded

the dates of those conversations in a journal.  (*Id.* at 121-22; *see also* Filing No. 44-4,

Plaintiff Dep. Ex. 17).  On one occasion, Trauner made a bookmark with a Bible verse on

4

it and gave it to Plaintiff as a gift.  (Trauner Dep. at 62, 64).  On another, Trauner gave

Plaintiff a printout from the church's website that Plaintiff's daughter was attending.

(Plaintiff Dep. at 118).  Trauner told Plaintiff that reading the Bible would help her

understand American society.  (*Id.* at 117).

### C.   Plaintiff's Review

Following the completion of her 90-day introductory employment period on June

28, 2012, Trauner increased Plaintiff's hourly wage to $15.25 an hour.  (*Id*. at 89, 116).

In her 90-day Performance Review, Trauner wrote, in relevant part:

> [Plaintiff] brings a great deal of skill and experience with her.  Her
> excitement and engagement in the position has produced fast paced learning
> and growth.  She discovers and suggests new and better ways to accomplish
> goals.
>
> I am able to trust that any project I give to Ella will be completed.  She is not
> afraid to ask questions and when she needs to and is able to work
> independently for the most part. . . .  This is Ella's first experience in the
> automotive retail environment and with the ADP system, but I am confident
> in her ability to learn quickly. . . .
>
> Ella is an excellent addition to our staff and company.

(Filing No. 55-6, 90-day Performance Review).

### D.   Payroll Errors

Plaintiff admits to only two errors during her employment at Stoops.  First, in June

2012, Stoops' sales manager, James Jarvis, emailed Plaintiff a computer file containing a

sales commission sheet that Jarvis dated for the previous week.  (Plaintiff Dep. at 148).

She mistook it as representing sales commissions for the present week, resulting in

paychecks reflecting the previous week's payroll figures.  (Trauner Dep. at 79; Plaintiff

Dep. at 148-49).  Plaintiff caught the error before checks were processed, and Plaintiff

and Trauner made timely corrections.  (Plaintiff Dep. at 149).

Second, in September 2012, she forgot to put Trauner's name in the payroll

system.  (*Id.* at 140).  She informed Trauner of her mistake, and told Trauner she would

double her salary the following week to correct the error.  (*Id.* at 141).  With Trauner's

approval, Plaintiff did so.  (*Id.*).

According to Stoops, Plaintiff made frequent payroll mistakes, including shorting

employees' pay and failing to charge for or remit child support payments.  (Trauner Dep.

at 84; Filing No. 44-7, Deposition of Linda Robinson at 33-36; Filing No. 44-3,

Deposition of James Jarvis ("Jarvis Dep.") at 11, 14; Filing No. 44-11, Deposition of

Kellie Stocking ("Stocking Dep.") at 29).  Trauner became aware of these and other

payroll errors based on complaints from sales managers about their employees'

paychecks as well as through her final review of payroll prior to issuing checks.  (Trauner

Dep. at 104; *see also* Jarvis Dep. at 11, 14; Stocking Dep. at 17, 29).  Kellie Stocking,

Stoops' Service Director, testified that "[t]here was just no confidence in payroll at all"

during Plaintiff's tenure and "[e]very single week someone was in my office

complaining."  (Stocking Dep. at 17, 26-27).

### E.    Bible Study

In early July 2012, Trauner informed Plaintiff that Stoops would be expanding its

operations and that a full-time payroll accountant position would be opening "by the end

of August [2012]."  (Trauner Dep. at 72).  Trauner showed Plaintiff where the new

administration office would be and asked Plaintiff if she wanted to move to a full time

6

position.  (*Id.* at 72).  Plaintiff said yes.  (Plaintiff Dep. at 155-56).  Trauner then asked

Plaintiff to read the Bible with her.  (*Id.* at 156-57).  Plaintiff finally agreed to "please

[Trauner]."  (*Id.* at 315).

Trauner told Plaintiff that they would have their Bible meetings in Stoops'

conference room on Thursday evenings from 5:00 p.m. to 7:00 p.m. after Plaintiff

clocked out.  (*Id*. at 160-61).  Each Thursday from July 2012 to September 13, 2012, the

two took turns reading Bible verses, beginning with Genesis I.  (Trauner Dep. at 64;

Plaintiff Dep. at 159-62).  Although Plaintiff did not enjoy the meetings, she did not

complain of the meetings with anyone at work because Trauner told her the meetings

were "personal" and between the two of them.  (Plaintiff Dep. at 210; Trauner Dep. at 67-

68).

After finding out that Stoops' building addition was not finished, Plaintiff "did not

want to tell [Trauner] directly [that] [she] d[id] not want to read the Bible with [her]", so

she enrolled her daughter in swimming and karate classes.  (Plaintiff Dep. at 161).  She

then told Trauner she did not have time to do Bible study anymore.  (*Id.*).  Their last

Bible study was held on September 13, 2012.  (*Id.* at 175).  Trauner "was very upset[,]"

and suggested that they read the Bible on Friday evenings.  (*Id.* at 161).  Plaintiff told

Trauner she would rather spend time with her family.  (*Id.* at 162).  Two weeks later,

Plaintiff's daughter broke her leg.  (*Id.*).

On January 23, 2013, Trauner overheard Plaintiff inform a co-worker that her

daughter's leg had healed.  (*Id.* at 162-63).  Trauner then called Plaintiff into her office

and asked if their Bible studies could resume.  (*Id.* at 163).  Plaintiff told Trauner she was

not interested.  (*Id.* at 164).  When Trauner asked Plaintiff why, Plaintiff stated that, since her mother was returning to China, she would need to send her daughter to daycare and would need to leave in time to pick her up before the daycare closed.  (*Id.*).  Trauner said, "Okay.  Think about it.  Maybe someday, you know, we can find some day."  (*Id.*).

### F.    Plaintiff is hired full time, and Trauner receives Goodin's resume

On January 25, 2013, Trauner offered Plaintiff the full-time payroll clerk position and asked Plaintiff to start immediately.  (*Id.* at 165).  Trauner "thought that maybe if [she] increased [Plaintiff's] hours that, you know, it would increase the learning opportunity that would take place faster."  (Trauner Dep. at 140).  Plaintiff accepted, but asked for additional time to begin so that she could give two weeks' notice to her other part-time employer, KinderCare.  (Plaintiff Dep. at 166-67).

Near the time that Trauner offered Plaintiff a full-time position, Trauner received a telephone inquiry from Lisa Goodin, who asked Trauner if there were any open positions at Stoops.  (Goodin Dep. at 8, 24).  Goodin received Trauner's contact information from Barbara Winegar, who also worked at Stoops.  (*Id*. at 21, 23).  Trauner told Goodin that Stoops did not have any open positions, but that Goodin was more than welcome to send in a resume.  (*Id*. at 23-24).  Goodin did so on January 27, 2013.  (*Id*. at 8).

Goodin had been employed for the last eleven years at Andy Mohr Ford as the assistant office manager.  (*Id.* at 14-16).  In that role, Goodin was in charge of payroll and taxes for four separate stores, which included nearly 600 employees.  (*Id.* at 19-20).  Goodin had over 19 years of experience in the auto dealership industry.  (Trauner Dep. at 123).

Trauner met with Goodin three times to interview her, assess her qualifications, and determine the possibility of employment with Stoops.  (Goodin Dep. at 31-32). Goodin was highly recommended by two of Stoops' department heads who had previously worked with Goodin.  (Trauner Dep. at 125-26).  Trauner perceived Goodin to be "exactly what [she] needed.  [Goodin] was work-ready.  She required no training." (*Id.* at 123).

### G.      Plaintiff is terminated and replaced by Goodin

On February 6, 2013, Plaintiff reported to Stoops to start full-time employment. (Plaintiff Dep. at 167).  Trauner told Plaintiff her first full-time day would be Monday, February 11, and that her hourly rate would change with the full-time position.  (*Id.*). Trauner told Plaintiff to wait until February 11 to complete payroll forms indicating her full time status change and wage increase, and that Trauner would sign the forms then. (*Id.* at 167-68).  On February 11, Trauner told Plaintiff that she was postponing the completion of the forms until March 28—the date of Plaintiff's annual performance review.  (*Id.* at 168).

The Friday before her termination (February 22), Trauner called Plaintiff into her office to familiarize her [Plaintiff] with promissory notes.  (*Id*. at 168-69).  That afternoon, Trauner asked Plaintiff if she was sure she could not read the Bible with her again.  (*Id*. at 169).  Plaintiff told her she could not.  (*Id*.).

On February 25, 2013, Trauner terminated Plaintiff's employment allegedly

because "she [was] not a good fit for [the] position."  (Plaintiff's Hearing[2] Ex. 5; *see also* Filing No. 55-39, Trauner Dep. at 104 ("[Plaintiff] was not fired because she made mistakes. . . .  She was fired because she was unprepared for the position that she was hired to do.  She was replaced by an individual who could come in and do the job.")).  Trauner "thought that [Plaintiff's] education would outweigh her lack of experience in the automotive industry, and it did not."  (Trauner Dep. at 111).  Plaintiff "required too much on my part in training.  It was too much to learn."  (*Id.*).  Two days later, Trauner hired Goodin.  (Goodin Dep. at 43, 49).  Unlike Plaintiff, Goodin is American-born, Causasian, and Christian.  (*Id.*).

Additional facts necessary to a determination of this motion will be addressed in the Discussion Section.

### III.   Discussion

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  The court will begin with Plaintiff's claim that Defendants violated Title VII by terminating her employment because of her race, national origin, and religion.

---

[2] This exhibit was admitted at the evidentiary hearing on Plaintiff's Motion for Sanctions, held on March 23, 2016.

### A.    Plaintiff's Title VII Claims

### 1.    Discrimination Claims

A Title VII plaintiff can show that she was a victim of intentional discrimination either by proceeding under the direct method or the indirect, burden-shifting method. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).  Here, Plaintiff proceeds under the direct method.

Under the direct method, the plaintiff may show, either through direct or circumstantial evidence, that the "employer's decision to take the adverse job action against h[er] was motivated by an impermissible purpose, such as sex." *Id.*  "Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption."  *Id.* This type of evidence generally involves an admission or a statement by the decision maker that his actions were motivated by discriminatory intent.  *Lewis v. Sch. Dist.* # 70, 523 F.3d 730, 742 (7th Cir. 2008).  A plaintiff may also establish her direct case by presenting a convincing mosaic of circumstantial evidence from which a reasonable juror could infer intentional discrimination by the decision maker.  *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).  A plaintiff's circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

Plaintiff does not have direct evidence of discrimination; accordingly, to survive summary judgment under the direct method, Plaintiff must present a convincing mosaic of circumstantial evidence from which a reasonable juror could infer intentional

discrimination by Defendants.  Plaintiff's mosaic may be comprised of three categories of circumstantial evidence, each of which is sufficient by itself to support a judgment for the plaintiff.  *Troupe*, 20 F.3d at 736.  The first category "consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent may be drawn."  *Id*.  The second category consists of evidence that similarly situated employees outside of the protected group (pregnancy, sex, race, etc.) received systematically better treatment.  *Id*.  The third category consists of "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination."  *Id*.  Whether under the direct or indirect method of proof, "the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination."  *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014); *see also Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 638 (7th Cir. 2001) (noting that "the pertinent question" in a Title VII case "is not whether a plaintiff has direct (including circumstantial) or indirect proof of discrimination, but whether [she] has presented sufficient evidence that [her employer's] decision . . . was motivated by an impermissible purpose").

This case is not about Plaintiff's race or national origin; it is about Trauner's quest to teach Plaintiff about Christianity through Bible study.  Indeed, Plaintiff's sole evidence of race and national origin discrimination arises from the fact that she was

replaced by a Caucasian American.  That fact alone is insufficient to raise a genuine issue of material fact regarding race and national origin discrimination.  *See, e.g., Shager v. Upjohn Co.*, 913 F.2d 398, 400 (7th Cir. 1990) (finding evidence insufficient to establish age discrimination where facts only establish older employee was replaced by a younger employee).  Accordingly, the court turns to Plaintiff's claim of religious discrimination.

Viewing the facts in the light most favorable to Plaintiff, a reasonable juror could find that Plaintiff's termination was motivated by her refusal to continue reading the Bible with Trauner.  Plaintiff received a very favorable review after completing her 90-day probationary period, and made only a few mistakes during her tenure there.  Although Plaintiff was not interested in learning about Christianity, Plaintiff felt she must participate in Bible study to "please" Trauner.  Trauner was quite upset after Plaintiff ended their Bible study in September 2012 due to her daughter's extracurricular activities (and later broken leg).  In January 2013, after learning that Plaintiff's daughter's leg had healed, Trauner asked Plaintiff if she would resume their Bible study.  Plaintiff said she was not interested.  The last time Trauner asked Plaintiff to participate in Bible Study was Friday, February 22.  Plaintiff was terminated the following Monday because she was not a "good fit" for the position.  A reasonable juror could disbelieve Trauner's reason for terminating Plaintiff in light of the fact that Trauner had recently offered her full-time employment with a raise.  Trauner replaced Plaintiff with Goodin, a Christian.  Thus, a reasonable juror could find that Trauner's real reason for terminating Plaintiff was not the fact that Goodin was more qualified and required little or no training, but because Plaintiff, a Buddhist, refused to continue Bible study with Trauner.

A reasonable juror, however, could find that Trauner offered to teach Plaintiff about Christianity solely because Plaintiff learned that her daughter wanted to be baptized in a Christian church and Plaintiff did not understand what baptism meant.  Indeed, Trauner testified that their Thursday-evening Bible studies were wholly unrelated to Plaintiff's job, as exemplified by the fact that Trauner gave her a favorable 90-day review and a raise after Plaintiff first rejected her offer to study the Bible, and offered Plaintiff full-time employment two days after she rebuffed her again.  A reasonable juror could also find that Defendants terminated Plaintiff not because of the mistakes she made, but because Goodin, who was far more qualified for the position than Plaintiff and, unlike Plaintiff, did not require extensive training.  And, a reasonable juror could believe that Goodin submitted her resume unsolicited by anyone at Stoops around the same time that Trauner offered Plaintiff a full time position, and that Goodin's Christian faith had nothing to do with her hiring.

Accordingly, for the reasons set forth above, Defendants' motion for summary judgment on Plaintiff's race and national origin claims is **GRANTED** and Defendants' motion for summary judgment on Plaintiff's religious discrimination claim is **DENIED**.

### 2. Harassment

Plaintiff also alleges she was subjected to harassment in the workplace on the basis of her race, national origin, and religion in violation of Title VII.  To prevail on her claim, Plaintiff must demonstrate that: "'(1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her [race, national origin, or religion]; (3) the conduct was either severe or pervasive; and (4) there

is a basis for employer liability.'" *Porter v. City of Chicago*, 700 F.3d 944, 955 (7th Cir. 2012) (quoting *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009)).  In determining whether the harassment rises to this level, the court considers the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 685 (7th Cir. 2010) (quoting *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806-07 (7th Cir. 2000)).  The court also assesses the impact of the harassment on the plaintiff's work environment from both a subjective and objective viewpoint; "'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Gentry v. Expert Packaging Co.*, 238 F.3d 842, 850 (7th Cir. 2001) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

As an initial matter, there is no evidence that anyone at Stoops made any derogatory or offensive comments about Plaintiff's race, national origin, or religion. Furthermore, there is no evidence that anyone made any comments to her that would make her feel physically threatened or humiliated, or that unreasonably interfered with her working environment to such an extent that she was working under conditions that a reasonable person would find *abusive*.  In fact, Plaintiff testified that her working environment was friendly and the people she worked with, including Trauner, were all very nice.  (Plaintiff Dep. at 63-64, 60-70).

Plaintiff's claim really boils down to Trauner's repeated requests to read the Bible. (*Id.* at 102-04).  According to her journal, Trauner asked Plaintiff to attend church or read

15

the Bible with her approximately twelve times over the course of seven months.  (*See* Plaintiff Dep. Ex. 17).  These requests were not accompanied with any threats or derogatory comments.  (Plaintiff Dep. at 220-221 ("Q:  Did she tell you you would be disciplined if you did not [read the Bible with her]?  A. No, she didn't.").  The requests were not accompanied by any promise or benefits.  (*Id.* at 265 ("Q: Did Ms. Trauner ever say to you if you read the Bible with me on Thursdays from 5:00 to whatever time, that I will give you additional time or additional hours?  A:  No, she did not say that.").  Likewise, Trauner never told Plaintiff that she disagreed with, or condemned, her Buddhist beliefs.  (*Id.* at 311 ("Q: Did she ever tell you she disagreed with Buddhist beliefs?  A: She didn't.")).

Moreover, Trauner never expressed any anger or emotion at Plaintiff's decision not to study the Bible with her.  (*Id.* at 302-03 ("Q: [D]id she ever get angry with you about not reading the Bible or not wanting to read the Bible or not meeting with her to read the Bible?  A: She did not show her emotion to me.")).  And Trauner never told Plaintiff that she should become a Christian.  (*Id.* at 311-12 ("Q: Did she ever tell you that you should be a Christian? You should go to church to be a Christian?  A: She told me I should go to church.  But she did not tell me Christian or whatever.")).

Notably, Plaintiff never complained about Trauner's requests to anyone at Stoops, despite her awareness of a complaint procedure under its harassment policy.  (*Id.* at 114, 127).  Likewise, Plaintiff never told Trauner that her alleged invitations to study the Bible were unwelcome or made her uncomfortable.  (*Id.* at 177).  Indeed, Plaintiff testified that

Trauner's conversations regarding religion were not a "big deal" and that her opinion only changed following her discharge.  (*Id.* at 114-15).

Viewing the evidence in the light most favorable to Plaintiff, the court finds Plaintiff fails to establish her claim for religious harassment as a matter of law.  *Cf. Byrd v. Postmaster General*, 582 Fed. Appx. 787, 791 (11th Cir. 2014) (finding coworker's conduct did not create a hostile working environment where (1) coworker sang religious songs, quoted religious scripture, preached and spoke about Church and the Bible; (2) referred to plaintiff as the devil an unspecified number of times over a six-month period; and (3) informed plaintiff that she would go to Hell for not believing in Jesus Christ); *Alansari v. Tropic Star Seafood Inc.*, 388 Fed. Appx. 902, 905 (11th Cir. 2010) (per curium) (finding that solicitations to go to church because "Jesus would save" plaintiff, other comments about the plaintiff's Muslim religion, and the playing of Christian music on the radio did not amount to hostile work environment); *DeFrietas v. Horizon Inv. & Mgmt. Corp.*, No. 2:06-cv-926, 2008 WL 204473, at *6 (D. Utah Jan. 28, 2008) ("Sporadic invitations to attend church with a co-worker, while uncomfortable, do not constitute a hostile work environment."), *aff'd in part and rev'd in part on other grounds*, 577 F.3d 1151 (10th Cir. 2009).  Accordingly, Defendants' motion for summary judgment on Plaintiff's claims for racial, national origin, and religious harassment is **GRANTED**.

### 3.    Retaliation

Title VII prohibits retaliating against an employee "because [she] has opposed any practice made . . . unlawful . . . by this subchapter, or because [she] has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Here, Plaintiff contends that Stoops retaliated against her "by denying her opportunities for employment and/or terminating her employment on the basis of her opposition to Stoops' unlawful employment practices in violation of Title VII."  (Filing No. 1, Compl. ¶ 38).

As with a discrimination claim, a Title VII plaintiff can prove retaliation under the direct or indirect method of proof.  *Majors v. General Elec. Co.*, 714 F.3d 527, 537 (7th Cir. 2013).  Under either method, a plaintiff must first establish that she engaged in statutorily protected activity.  *Id.*  "An employee engages in protected activity by either: (1) filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes; or (2) opposing an unlawful employment practice."  *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013).  Here, Plaintiff did neither.  In fact, she admits she never complained to anyone at Stoops regarding Trauner's invitations to study the Bible until after her termination.  (Plaintiff Dep. at 114, 126-27, 177).  Accordingly, Defendants' motion for summary judgment on Plaintiff's claim for retaliation is **GRANTED**.

**B.      Plaintiff's State Law Claim for Intentional Infliction of Emotional Distress**

A claim for intentional infliction of emotional distress requires a plaintiff to show that the defendant: (1) engaged in extreme and outrageous conduct; (2) which intentionally or recklessly; (3) caused; (4) severe emotional distress to the plaintiff.  *Rihm v. Hancock Cnty. Pub. Library*, 954 F. Supp. 2d 840, 858 (S.D. Ind. 2013) (citing

18

*Waldrip v. Waldrip*, 976 N.E.2d 102, 117 (Ind. Ct. App. 2012)).  "The requirements to prove this tort are rigorous." *Branham v. Celadon Trucking Servs., Inc.*, 744 N.E.2d 514, 523 (Ind. Ct. App. 2001) (citations omitted).  It is "found where conduct exceeds all bounds usually tolerated by a decent society and causes mental distress of a very serious kind. . . . In the appropriate case, the question can be decided as a matter of law." *Id.*

"Indiana courts have been reluctant to award damages for intentional infliction of emotional distress in employment cases."  *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1167 (7th Cir. 1997).  "Generally, disciplining and terminating an employee is not severe enough to meet the standard to show extreme and outrageous conduct" unless it is accompanied by "threats, insults, harassment, or harsh language." *Walton v. U.S. Steel Corp.*, No. 2:10-cv-188, 2010 WL 6681725, at *11 (N.D. Ind. Dec. 21, 2012).  "A termination that was done matter-of-factly will not satisfy this standard."  *Id.*

Plaintiff argues that Trauner's decision to terminate Plaintiff's employment after Plaintiff quit her part-time job in reliance on a full-time position at Stoops was "extreme and outrageous."  Even when viewed in the light most favorable to Plaintiff, the evidence does not support her claim.  Plaintiff was terminated in a civil and professional manner. Trauner invited Plaintiff into her office at the end of the day to inform her of her termination in private.  (Plaintiff Dep. at 189-91).  Trauner did not use any offensive or harsh language, nor did she threaten Plaintiff in any way.  (*Id.*).  There is nothing, therefore, that would warrant a reasonable person to exclaim "Outrageous!" Accordingly, Defendants' motion for summary judgment on Plaintiff's claim for intentional infliction of emotional distress is **GRANTED**.

**IV.     Conclusion**

The court finds no genuine issue of material fact exists on Plaintiff's Title VII claims for race and national origin discrimination; race, national origin, and religious harassment; and on Plaintiff's claim for Title VII retaliation.  The court further finds no genuine issue of material fact exists on Plaintiff's state law claim for intentional infliction of emotional distress.  Therefore, Defendants' Motion for Summary Judgment (Filing No. 42) is **GRANTED** on: (1) Plaintiff's Title VII discrimination claims based on her race and national origin; (2) Plaintiff's Title VII harassment claims based on her race, national origin, and religion; (3) Plaintiff's Title VII retaliation claim; and (4) Plaintiff's state law claim for intentional infliction of emotions distress.  The court finds a genuine issue of material fact exists with respect to Plaintiff's Title VII religious discrimination claim. Defendants' Motion for Summary Judgment is **DENIED** on that claim.


**SO ORDERED** this 24th day of May 2016.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana



Distributed Electronically to Registered Counsel of Record.